# WALTER *v.* UNITED STATES

No. 79–67.   Argued February 26, 1980—Decided June 20, 1980*

---

*Together with No. 79–148, *Sanders et al.* v. *United States,* also on certiorari to the same court.

650

Stevens, J., announced the judgment of the Court and delivered an opinion, in which Stewart, J., joined. White, J., filed an opinion concurring in part and in the judgment, in which Brennan, J., joined, *post*, p. 660. Marshall, J., concurred in the judgment. Blackmun, J., filed a dissenting opinion, in which Burger, C. J., and Powell and Rehnquist, JJ., joined, *post*, p. 662.

*W. Michael Mayock* argued the cause and filed a brief for petitioner in No. 79–67. *Glenn Zell* argued the cause and filed a brief for petitioners in No. 79–148.

*Elliott Schulder* argued the cause for the United States in both cases. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann, Jerome M. Feit,* and *Patty Merkamp Stemler.*

Mr. Justice Stevens announced the judgment of the Court and delivered an opinion, in which Mr. Justice Stewart joined.

Having lawfully acquired possession of a dozen cartons of motion pictures, law enforcement officers viewed several reels of 8-millimeter film on a Government projector. Labels on the individual film boxes indicated that they contained obscene pictures. The question is whether the Fourth Amendment required the agents to obtain a warrant before they screened the films.

Only a few of the bizarre facts need be recounted. On September 25, 1975, 12 large, securely sealed packages containing 871 boxes of 8-millimeter film depicting homosexual activities were shipped by private carrier from St. Petersburg, Fla., to Atlanta, Ga. The shipment was addressed to "Leggs, Inc.," [1] but was mistakenly delivered to a substation in the suburbs of Atlanta, where "L'Eggs Products, Inc.," regularly received deliveries. Employees of the latter company opened

---

[1] There was no "Leggs, Inc." "Leggs" was the nickname of a woman employed by one of petitioners' companies. The packages indicated that the intended recipient would pick them up and pay for them at the carrier's terminal in Atlanta.

each of the packages, finding the individual boxes of film. They examined the boxes, on one side of which were suggestive drawings, and on the other were explicit descriptions of the contents. One employee opened one or two of the boxes, and attempted without success to view portions of the film by holding it up to the light.[2] Shortly thereafter, they called a Federal Bureau of Investigation agent who picked up the packages on October 1, 1975.

Thereafter, without making any effort to obtain a warrant or to communicate with the consignor or the consignee of the shipment, FBI agents viewed the films with a projector. The record does not indicate exactly when they viewed the films, but at least one of them was not screened until more than two months after the FBI had taken possession of the shipment.[3]

On April 6, 1977, petitioners were indicted on obscenity charges relating to the interstate transportation of 5 of the 871 films in the shipment. A motion to suppress and return the films was denied, and petitioners were convicted on multiple counts of violating 18 U. S. C. §§ 371, 1462, and 1465. Over Judge Wisdom's dissent, the Court of Appeals for the Fifth Circuit affirmed, 592 F. 2d 788, and rehearing was denied, 597 F. 2d 63 (1979). We granted certiorari, 444 U. S. 914,[4] and now reverse.

---

[2] Each reel was eight millimeters in width. Petitioner Walter informs us that, excluding three millimeters for sprocketing and one millimeter for the border, the film itself is only four millimeters wide. Brief for Petitioner in No. 79–67, p. 30, n. 8. Since the scenes depicted within the frame are necessarily even more minute, it is easy to understand why such films cannot be examined successfully with the naked eye.

[3] The FBI had meanwhile received no request from the consignee or the consignor of the films for their return, but the agents had been told by employees of L'Eggs Products, Inc., that inquiries had been made as to their whereabouts.

[4] The petition for certiorari in No. 79–67 presented 10 separate questions, and the petition in No. 79–148 presented 5 separate questions. Except

In his concurrence in *Stanley* v. *Georgia,* 394 U. S. 557, 569, MR. JUSTICE STEWART expressed the opinion that the warrantless projection of motion picture films was an unconstitutional invasion of the privacy of the owner of the films. After noting that the agents in that case were lawfully present in the defendant's home pursuant to a warrant to search for wagering paraphernalia, MR. JUSTICE STEWART wrote:

> "This is not a case where agents in the course of a lawful search came upon contraband, criminal activity, or criminal evidence in plain view. For the record makes clear that the contents of the films could not be determined by mere inspection. . . . After finding them, the agents spent some 50 minutes exhibiting them by means of the appellant's projector in another upstairs room. Only then did the agents return downstairs and arrest the appellant.

> "Even in the much-criticized case of *United States* v. *Rabinowitz,* 339 U. S. 56, the Court emphasized that 'exploratory searches . . . cannot be undertaken by officers with or without a warrant.' *Id.,* at 62. This record presents a bald violation of that basic constitutional rule. To condone what happened here is to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant.

> "Because the films were seized in violation of the Fourth and Fourteenth Amendments, they were inadmis-

---

with respect to the issues discussed in the text, we have determined that certiorari was improvidently granted. We therefore dismiss as to the other questions that have been briefed and argued. For purposes of decision, we accept the Government's argument that the delivery of the films to the FBI by a third party was not a "seizure" subject to the warrant requirement of the Fourth Amendment.

sible in evidence at the appellant's trial." *Id.,* at 571–572 (footnote omitted).

Even though the cases before us involve no invasion of the privacy of the home, and notwithstanding that the nature of the contents of these films was indicated by descriptive material on their individual containers, we are nevertheless persuaded that the unauthorized exhibition of the films constituted an unreasonable invasion of their owner's constitutionally protected interest in privacy. It was a search; there was no warrant; the owner had not consented; and there were no exigent circumstances.

It is perfectly obvious that the agents' reason for viewing the films was to determine whether their owner was guilty of a federal offense. To be sure, the labels on the film boxes gave them probable cause to believe that the films were obscene and that their shipment in interstate commerce had offended the federal criminal code. But the labels were not sufficient to support a conviction and were not mentioned in the indictment. Further investigation—that is to say, a search of the contents of the films—was necessary in order to obtain the evidence which was to be used at trial.

The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents. Ever since 1878 when Mr. Justice Field's opinion for the Court in *Ex parte Jackson,* 96 U. S. 727, established that sealed packages in the mail cannot be opened without a warrant, it has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents.[5] See *Arkansas* v. *Sanders,* 442 U. S. 753, 758; *United*

---

[5] "In th[e] enforcement [of regulations as to what may be transported in the mails], a distinction is to be made between different kinds of mail matter,—between what is intended to be kept free from inspection, such as letters, and sealed packages subject to letter postage; and what is open to inspection, such as newspapers, magazines, pamphlets, and other printed matter, purposely left in a condition to be examined. Letters and

*States* v. *Chadwick,* 433 U. S. 1, 10. When the contents of the package are books or other materials arguably protected by the First Amendment, and when the basis for the seizure is disapproval of the message contained therein, it is especially important that this requirement be scrupulously observed.[6]

---

sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household. No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the Constitution." 96 U. S., at 732–733.

And later in his opinion, Mr. Justice Field again noted that "regulations excluding matter from the mail cannot be enforced in a way which would require or permit an examination into letters, or sealed packages subject to letter postage, without warrant, issued upon oath or affirmation, in the search for prohibited matter. . . ." *Id.,* at 735.

[6] "This is the history which prompted the Court less than four years ago to remark that '[t]he use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new.' *Marcus* v. *Search Warrant,* 367 U. S. 717, at 724. 'This history was, of course, part of the intellectual matrix within which our constitutional fabric was shaped. The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression.' *Id.,* at 729. As Mr. Justice Douglas has put it, 'The commands of our First Amendment (as well as the prohibitions of the Fourth and the Fifth) reflect the teachings of *Entick* v. *Carrington,* [19 How. St. Tr. 1029 (1765)]. These three amendments are indeed closely related, safeguarding not only privacy and protection against self-incrimination

Nor does the fact that the packages and one or more of the boxes had been opened by a private party before they were acquired by the FBI excuse the failure to obtain a search warrant. It has, of course, been settled since *Burdeau* v. *McDowell*, 256 U. S. 465, that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and that such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully. See *Coolidge* v. *New Hampshire*, 403 U. S. 443, 487–490. In these cases there was nothing wrongful about the Government's acquisition of the packages or its examination of their contents to the extent that they had already been examined by third parties. Since that examination had uncovered the labels, and since the labels established probable cause to believe the films were obscene, the Government argues that the limited private search justified an unlimited official search. That argument must fail, whether we view the official search as an expansion of the private search or as an independent search supported by its own probable cause.

When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization.[7] Consent

---

but "conscience and human dignity and freedom of expression as well." ' *Frank* v. *Maryland*, 359 U. S. 360, 376 (dissenting opinion).

"In short, what this history indispensably teaches is that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." *Stanford* v. *Texas*, 379 U. S. 476, 484–485.

See also *Roaden* v. *Kentucky*, 413 U. S. 496, 501. Although there were 871 reels of film in the shipment, there were only 25 different titles. Since only five of the titles were used as a basis for prosecution, it may be presumed that the other films were not obscene.

[7] "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron* v. *United States*, 275 U. S. 192, 196.

to search a garage would not implicitly authorize a search of an adjoining house; a warrant to search for a stolen refrigerator would not authorize the opening of desk drawers. Because "indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment," *Payton* v. *New York,* 445 U. S. 573, 583, that Amendment requires that the scope of every authorized search be particularly described.[8]

If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied to any official use of a private party's invasion of another person's privacy. Even though some circumstances—for example, if the results of the private search are in plain view when materials are turned over to the Government—may justify the Government's reexamination of the materials, surely the Government may not exceed the scope of the private search unless it has the right to make an independent search. In these cases, the private party had not actually viewed the films. Prior to the Government screening, one could only draw inferences about what was on the films.[9] The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained.[10]

---

[8] The Warrant Clause of the Fourth Amendment expressly provides that no warrant may issue except those "particularly describing the place to be searched, and the persons or things to be seized."

[9] Since the viewing was first done by the Government when it screened the films with a projector, we have no occasion to decide whether the Government would have been required to obtain a warrant had the private party been the first to view them.

[10] The fact that the labels on the boxes established probable cause to believe the films were obscene clearly cannot excuse the failure to obtain a

The Government claims, however, that because the packages had been opened by a private party, thereby exposing the descriptive labels on the boxes, petitioners no longer had any reasonable expectation of privacy in the films, and that the warrantless screening therefore did not invade any privacy interest protected by the Fourth Amendment. But petitioners expected no one except the intended recipient either to open the 12 packages or to project the films. The 12 cartons were securely wrapped and sealed, with no labels or markings to indicate the character of their contents.[11] There is no reason why the consignor of such a shipment would have any lesser expectation of privacy than the consignor of an ordinary locked suitcase.[12] The fact that the cartons were unexpectedly

warrant; for if probable cause dispensed with the necessity of a warrant, one would never be needed.

Contrary to the dissent, *post*, at 665–666, n. 3, there were no impracticalities in these cases that would vitiate the warrant requirement. The inability to serve a warrant on the owner of property to be searched does not make execution of the warrant unlawful. See ALI, Model Code of Pre-Arraignment Procedure § 220.3 (4) (Prop. Off. Draft 1975). Obviously, such inability does not render a warrant unnecessary under the Fourth Amendment. Nor is it clear in these cases that it would have been impossible to serve petitioners with a search warrant had the FBI made any effort to find them prior to screening the films. See n. 3, *supra*.

[11] For the same reason, one may not deem petitioners to have consented to the screening merely because the labels on the unexposed boxes were explicit.

Nor can petitioners' failure to make a more prompt claim to the Government for return of the films be fairly regarded as an abandonment of their interest in preserving the privacy of the shipment. As subsequent events have demonstrated, such a request could reasonably be expected to precipitate criminal proceedings. We cannot equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of any interest in the contents of the cartons. In any event, the record in these cases does indicate that the defendants made a number of attempts to locate the films before they were examined by the FBI agents.

[12] The consignor's expectation of privacy in the contents of a carton delivered to a private carrier must be measured by the condition of the package at the time it was shipped unless there is reason to assume that

opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part.[13] It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection.[14] Since the additional search conducted by the FBI—the screening of the films—was not supported by any justification, it violated that Amendment.

We therefore conclude that the rationale of Mr. Justice Stewart's concurrence in *Stanley* v. *Georgia,* 394 U. S. 557,

---

it would be opened before it arrived at its destination. Thus, for example, if a gun case is delivered to a carrier, there could then be no expectation that the contents would remain private, cf. *Arkansas* v. *Sanders,* 442 U. S. 753, 764–765, n. 13; but if the gun case were enclosed in a locked suitcase, the shipper would surely expect that the privacy of its contents would be respected.

The dissent asserts, *post,* at 665, that "[a]ny subjective expectation of privacy on the part of petitioners was undone . . . by their own actions and the private search." But it is difficult to understand how petitioners' subjective expectation of privacy could have been altered in any way by subsequent events of which they were obviously unaware.

[13] A partial invasion of privacy cannot automatically justify a total invasion. As Learned Hand noted in a somewhat different context: "It is true that when one has been arrested in his home or his office, his privacy has already been invaded; but that interest, though lost, is altogether separate from the interest in protecting his papers from indiscriminate rummage, even though both are customarily grouped together as parts of the 'right of privacy.'" *United States* v. *Rabinowitz,* 176 F. 2d 732, 735 (CA2 1949), rev'd, 339 U. S. 56. Judge Hand's view was ultimately vindicated in *Chimel* v. *California,* 395 U. S. 752, 768, which specifically disapproved this Court's decision in *Rabinowitz.* See also Mr. Justice Stewart's opinion concurring in the result in *Stanley* v. *Georgia,* 394 U. S. 557, 571–572, quoted *supra,* at 653–654.

[14] It is arguable that a third party's inspection of the contents of "private books, papers, memoranda, etc." could be so complete that there would be no additional search by the FBI when it re-examines the materials. Cf. *Burdeau* v. *McDowell,* 256 U. S. 465, 470. But this is not such a case, because it was clearly necessary for the FBI to screen the films, which the private party had not done, in order to obtain the evidence needed to accomplish its law enforcement objectives.

is applicable to these cases and that it requires that the judgments of the Court of Appeals be reversed.

*It is so ordered.*

Mr. Justice Marshall concurs in the judgment.

Mr. Justice White, with whom Mr. Justice Brennan joins, concurring in part and concurring in the judgment.

I agree with Mr. Justice Stevens that the Government's warrantless projection of the films constituted a search that infringed petitioners' Fourth Amendment interests despite the fact that the Government had acquired the films from a private party.[1] I write separately, however, because I disagree with Mr. Justice Stevens' suggestion that it is an open question whether the Government's projection of the films would have infringed any Fourth Amendment interest if private parties had projected the films before turning them over to the Government, *ante,* at 657, n. 9. The notion that private searches insulate from Fourth Amendment scrutiny subsequent governmental searches of the same or lesser scope is inconsistent with traditional Fourth Amendment principles. Nor does it follow from our recognition in *Burdeau* v. *McDowell,* 256 U. S. 465 (1921), and *Coolidge* v. *New Hampshire,* 403 U. S. 443, 487–490 (1971), that the Fourth Amendment proscribes only governmental action.[2]

---

[1] Although Mr. Justice Stevens' opinion refers to the films as having been "lawfully acquired" by the Government, *ante,* at 651, 654, 656, I note that he does not reach the question whether the Government's acquisition of the films was a "seizure" subject to the warrant requirement of the Fourth Amendment, *ante,* at 653, n. 4, a question on which the Court of Appeals was divided. 592 F. 2d 788, 792–793, 800–802 (CA5 1979). Likewise, I do not address this question.

[2] Neither *Burdeau* v. *McDowell* nor *Coolidge* v. *New Hampshire* supports the proposition that private searches insulate subsequent governmental searches from Fourth Amendment scrutiny. In *Burdeau* the Court held that the actions of a private party in illegally seizing evidence will not be attributed to the Government for Fourth Amendment purposes

I agree with MR. JUSTICE STEVENS that there was "nothing wrongful" about the Government's examination of the contents of the packages that had been opened by private parties. When the private parties turned the films over to the Government, the packages already had been opened, and the Government saw no more than what was exposed to plain view. No, Fourth Amendment interest was implicated by this conduct because the opening of the packages cannot be attributed to the Government and considered a governmental search.[3]   As the Court noted in *Coolidge* v. *New Hampshire, supra,* at 489, where a private party produced evidence for government inspection, "it was not incumbent on the police to stop her or avert their eyes."

This does not mean, however, that the Government subsequently may conduct the same kind of search that private parties have conducted without implicating Fourth Amendment interests.   The contrary view would permit Government agents to conduct warrantless searches of personal property whenever probable cause exists as a result of a prior private search.   We have previously held, however, that police must obtain a warrant before searching a suspect's luggage even

---

when the private party turns the evidence over to the Government.   The Court noted that because "no official of the Federal Government had anything to do with the wrongful seizure of the petitioner's property, . . . [i]t is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another."   256 U. S., at 475.   Similarly, in *Coolidge* v. *New Hampshire,* the Court held that a wife's voluntary action in turning over to police her husband's guns and clothing did not constitute a search and seizure by the government.   403 U. S., at 487–490.

[3] Because the private party's opening of the packages exposed their contents to plain view and made it unnecessary for the FBI agents to open the packages, there was no governmental search when the FBI viewed their contents.   Except in such circumstances, I do not understand how a third party's inspection of a package's contents "could be so complete that there would be no additional search by the FBI when it re-examines the materials," *ante,* at 659, n. 14.

if they have probable cause to believe that it contains contraband. *Arkansas* v. *Sanders,* 442 U. S. 753 (1979); *United States* v. *Chadwick,* 433 U. S. 1 (1977). The fact that such probable cause may be the product of a private search would not alter the need to comply with the warrant requirement. Thus, if the private parties in these cases had projected the films before turning them over to the Government, the Government still would have been required to obtain a warrant for its subsequent screening of them. As MR. JUSTICE STEVENS recognizes, petitioners possessed a legitimate expectation of privacy in the films, and this expectation was infringed by the Government's unauthorized screening of them. Unlike the opening of the packages that destroyed their privacy by exposing their contents to the plain view of subsequent observers, a private screening of the films would not have destroyed petitioners' privacy interest in them. Thus the Government's subsequent screening of the films constituted an independent, governmental search that would have infringed petitioners' Fourth Amendment interests without regard to any previous screening by private parties.

I therefore concur in part and in the judgment.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join, dissenting.

The Court at least preserves the integrity of the rule specifically recognized long ago in *Burdeau* v. *McDowell,* 256 U. S. 465 (1921). That rule is to the effect that the Fourth Amendment proscribes only governmental action, and does not apply to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.

I disagree with MR. JUSTICE STEVENS' opinion's parsing of the cases' "bizarre facts" see *ante,* at 651, to reach a result that

the Government's screening of the films in question was an additional and unconstitutional search. The facts, indeed unusual, convince me that, by the time the FBI received the films, these petitioners had no remaining expectation of privacy in their contents.

The cartons in which the films were contained were shipped by petitioners via Greyhound, a private carrier, to a fictitious addressee, and with the shipper fictitiously identified. The private examination of the packages by employees of L'Eggs Products, Inc., whom Greyhound innocently asked to pick up the packages, revealed that they contained films and that the films were of an explicit sexual nature. This was obvious from the drawings and labels on the containers, drawings that MR. JUSTICE STEVENS' opinion describes as "suggestive," and descriptions he refers to as "explicit." *Ante,* at 652. The containers thus clearly revealed the nature of their contents. See 592 F. 2d 788, 793–794, and n. 5 (CA5 1979). The opinion acknowledges that "there was nothing wrongful about the Government's acquisition of the packages or its examination of their contents to the extent that they had already been examined by third parties." *Ante,* at 656. But in finding that the FBI's "projection of the films was a significant expansion of the search that had been conducted previously by a private party," *ante,* at 657, the opinion seems conveniently to have overlooked the fact that the FBI received the film cartons *after* they had been opened, and *after* the films' labels had been exposed to the public.

I agree with the conclusion reached by the Court of Appeals' majority:

> "Under these circumstances, since the L'Eggs employees so fully ascertained the nature of the films before contacting the authorities, we find that the FBI's subsequent viewing of the movies on a projector did not 'change the nature of the search' and was not an additional search

subject to the warrant requirement." 592 F. 2d, at 793–794.[1]

The STEVENS opinion's contrary conclusion apparently is based on the view that petitioners had a legitimate expectation of privacy in the contents of these films, which they had protected by sealing them securely in the proverbial "plain brown wrapper," that was "frustrated" only "in part," *ante,* at 659, by the earlier private search.[2] But it seems to me that the opinion ignores the fact that the partial frustration of petitioners' subjective expectation of privacy was directly attributable to their own actions. The District Court described it well when it ruled:

"And it seems to me, under the circumstances of this case, that shipping or causing or suffering to be shipped by a common carrier, namely, Greyhound Bus Lines, with a fictitious name given for the shipper as well as the fictitious name given for the consignee or addressee,

---

[1] The Court of Appeals noted, 592 F. 2d, at 794, n. 6, and placed some reliance on, the observations of Judge William H. Webster in his dissenting opinion in *United States* v. *Haes,* 551 F. 2d 767 (CA8 1977):

"Can it be seriously argued that an agent receiving a suspected book or magazine from a freight carrier employee could not reasonably open the publication and peruse its pages to determine whether its contents offended the law? . . . Would a government agent who used a magnifying glass or other mechanical aid to identify an object be vulnerable to a claim of an unreasonable search independent of the lawful private search which produced the object? I think clearly not.

"The film in this case was not a means of concealing something else. In looking at the film through a projector, the agents did no more than view the motion pictures in the manner in which they were intended to be viewed." *Id.,* at 772–773 (footnote omitted).

The present cases are even stronger ones for recognizing the legality of the Government's projection of the film than the case Judge Webster posed. When the FBI screened these films, they already were aware of the nature of their contents.

[2] In contrast, I am at a loss to explain the conclusion stated in MR. JUSTICE WHITE's opinion, *ante,* at 662, that even "a private screening of the films would not have destroyed petitioners' privacy interest in them."

amounts to a relinquishment or abandonment of any reasonable expectation of privacy.

"Or, stated another way, it seems to me that it was reasonably foreseeable in those circumstances that what actually occurred would occur. That is to say, that there was substantial likelihood that the material would be misdelivered and fall into the hands of some third party, as actually happened in this case, where it would be opened and its privacy, if it had any, invaded." App. 37–38, quoted in part in 592 F. 2d, at 791.

Given the facts, and the STEVENS opinion's conclusions based thereon, I cannot help but wonder at the concession that "if a gun case is delivered to a carrier, there could then be no expectation that the contents would remain private." Ante, at 659, n. 12. The films in question were in a state no different from MR. JUSTICE STEVENS' hypothetical gun case when they reached the FBI. Their contents were obvious from "the condition of the package," ante, at 658, n. 12, and those contents had been exposed as a result of a purely private search that did not implicate the Fourth Amendment. Moreover, it was petitioners' own actions that made it likely that such a private search would occur. The opinion fails to explain, at least to my satisfaction, why petitioners' subjective expectation of privacy at the time they shipped the films, rather than at the time the films came into possession of the FBI (with the resulting protection of constitutional safeguards from unreasonable governmental action), controls this inquiry. Any subjective expectation of privacy on the part of petitioners was undone by that time by their own actions and the private search. In any event, it was abandoned by their shunning the property, under the circumstances of these cases, for over 20 months.[3]

---

[3] All this is reinforced by the impracticalities the Court would impose upon the FBI in these cases. The STEVENS opinion and the WHITE opinion both insist that a warrant should have been obtained before any of the

We tend occasionally to strain credulity and to spin the thread of argument so thin that we depart from the common-sense approach to an obvious fact situation. It seems to me to be beyond the limits of sound precedent to exclude the evidence of petitioners' crimes in the face of the "bizarre" developments that transpired here, developments that petitioners brought upon themselves. But the cases are strange and particular ones. The margin for reversal is narrow, and I rest assured that sound constitutional precepts will survive the result the Court reaches today.

I would affirm the judgments of the Court of Appeals.

---

films were viewed. One might inquire, on whom would the warrant be served? Surely, not on L'Eggs Products, Inc., which no longer had possession and wanted only to wish these films a speedy good riddance. And surely not on the shippers, who purposefully had concealed their identities.