Welch, J.
The defendant has moved to suppress the fruits of a warrantless search of his home. In a nut shell, the defendant argues that the Massachusetts State Police conducted a search, using his estranged wife as an agent of the police, and that this warrantless search fell within no exception of the general prohibition of warrantless searches. In addition, the defendant argues that, even if the Commonwealth legally came in possession of his clothing, the result of any testing to the clothing should be suppressed because the further testing of the clothing constituted a further search, again not justified by warrant. Despite the ingenuity of counsel, this motion must be denied.
FACTUAL FINDINGS
On January 14, 1999, a Massachusetts State Trooper by the name of Pi Downsborough was made aware that the defendant’s step-daughter, a fourteen-year-old girl, had made allegations that she had been sexually abused by the defendant. Trooper Downsborough arrived at the Lawrence District Court at approximately 10:00 a.m. to observe the defendant being arraigned on the child rape charges and witnessed the defendant’s wife, one Carmen Aviles, obtain a chapter 209A restraining order prohibiting the defendant from returning to their residence. The defendant was a Lawrence Police Officer.
Trooper Downsborough understood that the defendant was likely to make bail on the child rape charge on that day. The Trooper also understood that the defendant was likely to return to the home, accompanied by a fellow Lawrence Police Officer and in accordance with the 209A order, to retrieve various personal belongings.
After the defendant’s wife had obtained the 209A order she and the alleged victim — the defendant’s step-daughter, Diana Centano — and Trooper Downsborough returned to the defendant’s home at 41 Kenneth Street in Lawrence, Massachusetts.
Not only was 41 Kenneth Street the home of the defendant, but it also was the home of Carmen Aviles, the defendant’s wife, and the home of the alleged victim, Diana Centano. Both Carmen Aviles and her daughter Diana resided in this residence. Trooper Downsborough proceeded to interview Diana Centano in her bedroom. Trooper Downsborough took pains to have this interview be a one-on-one interview outside the presence of the mother, Carmen Aviles, who was not in the room. Instead she was in another portion of the residence. Through this interview, Trooper Downsborough first learned about the details of the alleged sexual assaults. The interview with Diana concluded after Diana broke down in tears. Trooper Downsborough summoned her mother, Carmen Avi-les, to Diana’s room to comfort the fourteen-year-old girl.
After having obtained information from Diana during the interview relating to the a series of sexual assaults, Trooper Downsborough then proceeded to ask Carmen Aviles for consent to search the home. The information that Trooper Downsborough obtained from Diana during this interview included allegations that the defendant had sexually assaulted the stepdaughter numerous times, including on two recent occasions. On these recent occasions, the defendant had allegedly ejaculated on the step-daughter’s stomach and wiped off his semen using once a towel and another time a white t-shirt. Based upon this information, Trooper Downsborough wished to obtain Diana’s clothing and bed linens for testing. Trooper Downsborough explained to Carmen Aviles that she wished to obtain these items from Diana in order to test them for semen and to use these items as evidence at any upcoming trial of the defendant. In furtherance of this desire, Trooper Downsborough, after the conclusion of her interview with Diana, requested that Carmen Aviles sign a consent to search form. Mrs. Aviles did so at approximately 3:00 p.m.
Carmen Aviles fully understood the consent form when she signed it, and she signed the document voluntarily. Indeed, this court finds that Carmen Avi-les signed the consent form eagerly and was extremely interested in obtaining evidence to assist in the prosecution of her now estranged husband. I fully credit Carmen Aviles’ testimony that she signed the consent form voluntarily after tibe Trooper had interviewed Diana and before the Trooper attempted to seize any evidence at the residence. After signing the consent form (Exhibit 1) Carmen Aviles observed Trooper *122 Downsborough begin to pick up dirty laundry from Diana’s laundry hamper (located in Diana’s bedroom). The Trooper placed the selected clothing, togetherwith Diana’s bed sheets, into a large pile on a quilt obtained from Diana’s bed. At this point, Carmen Aviles decided on her own to go to the bathroom of the residence and carried out another hamper containing dirty clothing. This hamper contained the clothing not of Diana, but of Carmen Aviles and her husband, the defendant. It was entirely Carmen Aviles’ idea to take this hamper out of the bathroom and begin to take clothing from the hamper to show to Trooper Downsborough. Trooper Downsborough never requested Carmen Avi-les to obtain the husband’s clothing. I credit Carmen Aviles’ testimony that she was the one who came up with the idea that the husband’s clothing might be of some evidentiaiy value.
As previously stated, the hamper from the bathroom not only contained the defendant’s soiled clothing, but also the dirty clothing of Carmen Aviles. Carmen Aviles was the family member in charge of taking the clothing from the hamper and washing it.
In the presence of Trooper Downsborough, Carmen Aviles began to pull clothing out of the hamper piece by piece, identified it, and asked Trooper Downsborough if she would be interested in particular pieces of clothing. Trooper Downsborough then indicated whether she would be interested in taking certain pieces of the defendant’s clothing for testing. By this method, Trooper Downsborough obtained approximately three t-shirts, one pair of shorts, and two pairs of underwear which belonged to the defendant.
After obtaining the clothing, Trooper Downsborough took the clothing and bed sheets to the Massachusetts State Police laboratory in order to have them tested for seminal fluid and any other appropriate tests. At no point was a warrant obtained.
LEGAL DISCUSSION
There is strong evidence that the defendant’s clothing was not even obtained pursuant to a "search” as defined by the United States or Massachusetts constitutions. A search only occurs when there is some state action. Of course, state action can include a private individual seizing an item at the direction of a police official, or when under the control of the police official. Commonwealth v. Jung, 420 Mass. 675, 686 (1995); Commonwealth v. Leone, 386 Mas. 329, 333 (1982). This was not the case here. It was Carmen Aviles who, motivated by her own desires, decided to look for her husband’s soiled clothing that might be incriminating. Thus, she was the one who decided to go into the bathroom, drag out the hamper, and begin displaying the clothing. The fact that Trooper Downsborough indicated which pieces of clothing she would be interested in taking does not convert this private acquisition of a husband’s clothing into a search.
Even if the seizure of the defendant’s clothing does constitute a search, it was a valid warrantless search due to the consent of Carmen Aviles.[1] There is little doubt that the defendant’s wife could give valid consent to search the home. Commonwealth v. Deeran, 364 Mass. 193, 195-96 (1973). See Commonwealth v. Sanna, 424 Mass. 92, 97-98 (1997); Commonwealth v. Ortiz, 422 Mass. 64, 70 (1996); Commonwealth v. Podgurski, 44 Mass. App. 929, 930 (1998). The fact that the wife was estranged from the husband at the time made no difference. Indeed, this is a depressingly common factual scenario. Deeran, 364 Mass. at 195; Podgurski, 44 Mass. App. at 930. Here, the wife was living at the residence and gave consent to search for matters that were within the common living area of the home and accessible to the wife. In fact, the wife’s clothing was intermingled with the defendant’s in the hamper, and she was responsible for taking possession of the clothing and for cleaning it. It is not a even a close call if there was valid consent in this case because the consent was voluntarily, knowing and eagerly given. Thus, the warrantless search was valid.
As a fall back position, the defendant offers the interesting argument that the further testing of the defendant’s clothing (apparently for semen stains) constituted an additional search and, therefore, also required a search warrant. The defendant relies upon the United States Supreme Court’s plurality opinion of Walter v. United States, 447 U.S. 649 (1980). In Walter, the United States Supreme Court invalidated a warrantless search of twelve sealed packages containing numerous boxes of films. Justice Stevens’ plurality opinion emphasized that the fact that “FBI agents were lawfully in possession of the boxes of films did not give them authority to search their contents.” In the Walter case, the films came into the possession of the FBI when they were delivered by mistake to a private company which then turned them over to the FBI. The private company that opened the boxes also discovered the films, the labels of which contained explicit descriptions of their allegedly obscene contents. The FBI agents then projected the films without obtaining a warrant. The opinion emphasizes that the contents of the films were arguably protected by the First Amendment and reasoned that the projection of the film went beyond the scope of the private search. Justice Steven’s opinion explained, “If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied by any official use of private parties’ invasion of another person’s privacy.” Id. at 657.
The Walter plurality opinion has not exhibited a vibrant longevity. Indeed, it may be considered to be a “sport” limited to its unique facts. The Supreme Judicial Court of Massachusetts, a court which has not been hesitant to interpret the Massachusetts Constitution as exceeding the protections provided by the Fourth Amendment, distinguished the Walter holding in its decision of Commonwealth v. Varney, 391 Mass. 34, 38-39 (1984). As the Supreme Judicial Court *123 explained, the Walter opinion relied heavily upon the first amendment concerns unique to that case. The Varney court held that the Walter case did not apply to situations where the government came lawfully into possession of something which appeared to be contraband. 391 Mass. at 41-42. In the Varney case, the matter in question was a glassy envelope containing a white powdery substance which was later tested to determine if the powdery substance was cocaine. This Supreme Judicial Court emphasized that scientific examination by government officials of the white powder did not endanger any “countervailing interest in free expression." Id. at 41. The Supreme Judicial Court also emphasized that it rejected any broad reading of Walter because “were we to accept these characterizations, we would be holding that the police must obtain a warrant anytime lawfully obtained evidence is to be subjected to scientific testing.” Id. at 39. Thus, the Supreme Judicial Court gave a narrow reading to the Walterplurality opinion. See Commonwealth v. Franco, 419 Mass. 635, 641 (1995) (officers who enter apartment pursuant to arrest warrant and discover “suspect substance in kitchen sink” are entitled to seize the substance and subsequently conduct tests).
Although the matters seized here, namely the defendant’s clothing, cannot be considered apparent contraband as in the Varney case, the same reasoning applies. Again, this case presents no First Amendment concerns that led the Supreme Court to its decision in Walter. To accept the defendant’s argument in this case, one would have to hold that any time the government lawfully comes into possession of an item of which it wants to further scientifically test, it must obtain a further warrant. No authority supports this position. In fact, the Supreme Judicial Court has termed this argument, in a similar setting, to be “without merit.” Commonwealth v. Robles, 423 Mass. 62, 65 n.8 (1996) (coat seized at time of arrest later chemically analyzed). Furthermore, this case, unlike the Walter case, involved a consent to search, which plainly envisioned further testing of the items seized. As Carmen Aviles knew at the time of signing the consent, further testing would be performed on the clothing to determine if it contained her husband’s semen. She was eager to provide evidence to be analyzed in this fashion. This was precisely what the Commonwealth did. Therefore, the Commonwealth’s testing did not exceed in any way the scope of the consent given.
CONCLUSION
Given this Court’s factual findings and legal reasoning, the defendant’s motion to suppress must be denied.

 The Commonwealth presents some half baked argument that the search was justified by some exigency. It was not.