IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 21, 2009 Session

**PAUL CARR MOSS, JR. v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Robertson County**
**No. 9860   John H. Gasaway, III, Judge**

_____

**No.  M2008-02820-CCA-R3-PC - Filed February 24, 2010**

_____

Petitioner, Paul Carr Moss, Jr., appeals the denial of post-conviction relief.  After Petitioner was convicted of the second degree murder of his wife, he appealed his conviction and sentence.  *State v. Moss*, 13 S.W.3d 374 (Tenn. Crim. App. 1999).  On appeal, his conviction and sentence was affirmed.  *Id.* at 389.  A petition for post-conviction relief was filed by the attorney who represented Petitioner on appeal.  Petitioner instructed the post-conviction court that the petition was submitted without his knowledge or consent and to ignore the petition. Petitioner subsequently filed a pro se petition for post-conviction relief.  Once counsel was appointed, Petitioner filed an amended petition for post-conviction relief.  After a hearing, the post-conviction court denied relief.  Petitioner appeals the denial.  After a review, we determine that the Petitioner has failed to show that he received ineffective assistance of counsel.  Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Paul Carl Moss, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; John Carney, District Attorney General, and Dent Morriss, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

Petitioner was indicted by the Robertson County Grand Jury for the first degree murder of his wife. After a trial, he was convicted of second degree murder. *Id.* at 376. Petitioner appealed his convictions and sentence to this Court, arguing that the trial court erred by allowing the State to present prior acts of misconduct between Petitioner and his minor daughter; that Tennessee Code Annotated section 40-38-205, is unconstitutional; and that the sentence imposed was excessive. This Court affirmed the convictions and sentence on appeal. *Moss*, 13 S.W.3d at 389.

The facts which led to Petitioner's second degree murder conviction were introduced into evidence during trial. According to the opinion on direct appeal, Petitioner's brother visited him on the morning of January 14, 1995. *Id.* at 376. Sometime during the visit, Petitioner called for his brother, telling him that his wife shot herself. When paramedics arrived, the victim was found in the bedroom with a single gunshot wound to the left earlobe. *Id.* Near the victim were a gun, one spent cartridge, and one live round of ammunition. *Id.* There also appeared to be a small, homemade bomb that appeared to have been detonated with wiring and a Christmas light. *Id.* The materials that were used to make the bomb were also found in the shed behind the house, along with ammunition for the gun. *Id.*

Petitioner's daughter testified at trial that her father made her uncomfortable and had sexually abused her in the past. *Id.* at 377-78. Petitioner's daughter spent some time in Florida during the previous summer with her aunt Cherl McSwain,[1] and wanted to remain in Florida because she did not want to live in Tennessee. *Id.* at 378.

Probably the most damaging evidence came in the form of an audiotape journal that was kept by Petitioner. Cherl McSwain discovered the tapes after the victim's death and turned them over to police. Portions of the tapes were played for the jury.

> Generally, the journals include statements about his financial problems, his marriage, and [his daughter]. Pertinent portions are as follows:
>
> September 6, 1994

---

[1] On direct appeal, the witness's name is spelled "Cheryl." During the post-conviction hearing, the witness informed the court reporter that her name was spelled "Cherl."

After five or six years, I realized that [the victim] wasn't ever going to change. By that time, I was tolerating it . . . and I have given up on her. Sex between us has dwindled to nearly nothing, to nothing, to absolutely nothing . . . . But I am the sick one, she says. She just won't admit it. The fact that she won't admit it frustrates me to no end and I can't help but wonder if she does that on purpose? Boy, she does. It really pushes my buttons but I am doing my damnest [sic] to control myself.

\* \* \*

It is time for me to take hold and do something, but I just don't know what to do. Biding my time is-I don't have time . . . . Everyday that this goes on, it's going to make it worse for [my children] . . . . [S]omething has to be done, I just don't know what. I am about to get desperate though, and desperation will make a man do things he never believed he could. I know that. It will be interesting to see just what it is that I finally come up with, because as it gets worse and as the pain gets worse, I am pushed so close to doing something desperate, it is scary. Because whatever it is, I am going to have to live with it or die with it, and essentially what that means is life as I know it will end, or as I knew it, back when it was happier. Hell, this is life and it wouldn't be so bad if the life I am enjoying now would end. That wouldn't be bad at all. . . . [L]ife is just getting ridiculous and it is mostly because of that damned woman, something must happen, something has got to happen.

September 20, 1994

I hate to think of all the time I have spent lately, thinking of illegal ways to get money because of the fact that many of the day-to-day problems that I have to deal with are monetarily based and would be solved with the application of funds, many of them. . . . [I]f I had a way right now that I could steal a hundred thousand dollars, if I thought that I would get away with it, I would do it. . . .

September 26, 1994

[The victim] is going to . . . build a wardrobe now and let me worry about paying the bills. It tell you what, I am really getting tired of it. I cannot tell you how tired of it I am getting. She has never been the type to steal money from us before, but it seems that that is what she is doing now.

October 6, 1994

[My counselor] said that . . . . I have . . . a lot of repressed anger to [the victim] which is absolutely true. . . . I think that everything I did to [MM], that she did not deserve, came from my repressed feelings towards [the victim].

October 8, 1994

Plus I found out that they questioned [my other children] while they were at school. No wonder people in the office have been treating me differently lately. No wonder they have. I swear to God a man could be innocent and this shit come down and . . . [e]verybody is going to believe it. . . . Well, I tell you what, this is just real damn aggravating. . . . I am really, really aggravated about this. I am tired of the way everything is going . . . It makes me want to do something drastic. I don't know what. . . .

October 13, 1994

Well, this has really got me frustrated. [The victim] can't handle her sisters. . . . They take the train of thought, the man needs to be punished and that they are the ones to do it, and they are trying to get [the victim] to do that, and that's pointless. . . . I have been so close to the edge for so long, that very much more and the responsibility that I feel towards my three children is going to begin to take less than a first priority in my life and when it does, whatever takes priority first is really going to get my attention and if revenge is it, I don't know that it won't be, it may be revenge becomes the driving force in my life. Assuming that it does, boy those bitches better say out of my way, all the fucking three of them. . ..

October 20, 1994

> But fortunately, me and [the victim] won't be together much longer. I have a feeling that come December, that the dam is going to break because I also decided that [MM] can't stay with Cheryl any longer. December will be the limit.

*Id.* at 378-79.

There was testimony that after Petitioner was arrested, he asked a friend to go to his home and destroy chloroform and gunpowder as well as locate some wire and keep it for him. *Id.* Petitioner also told this person that he had access to $100,000. *Id.* A man that worked with Petitioner recalled Petitioner claiming to have purchased additional life insurance the summer prior to the victim's death. *Id.* Petitioner also told this co-worker that "he wouldn't mind giving up twenty thousand to solve his problem." *Id.* Petitioner had previously referred to the victim as "his problem." *Id.* The co-worker thought that Petitioner wanted to kill his wife and knew that Petitioner was familiar with making small bombs because he had made them previously at work. *Id.*

Evidence was introduced that there was a $100,000 life insurance policy on the victim that named Petitioner as the beneficiary. *Id.* at 380. Several people testified that Petitioner and the victim had marital problems and that Petitioner suffered from a bad back. Petitioner took the stand in his own defense. *Id.* His testimony revealed:

> The defendant testified that he and the victim had lived together sixteen years and had four living children. He recalled that he and the victim purchased life insurance policies in 1988 and that, the summer of 1994, the victim acquired an additional policy through her employer. The defendant denied having had a conversation with [a coworker] in which he discussed using twenty thousand dollars of the life insurance proceeds to get rid of his "problem." He claimed that the changes to the policies in December of 1994 were routine.
>
> . . . .
>
> The defendant stated that in the fall of 1994 he started a journal, sought counseling, and began taking Prozac to treat depression. He spoke to an attorney about a divorce and discussed the topic with the victim on several

occasions. He claimed that he and the victim had agreed that the children would be permitted to choose the parent with whom to live. The tenants of their rental property had been asked to vacate so that the victim could reside there. He had contacted the attorney again around Christmas of 1994 and he noted in his journal that "[the victim] will be able to step right into her new life without me." At trial, the defendant explained that he had meant that she would have a nice house, a nice neighborhood, and affordable expenses.

The defendant acknowledged that he had made homemade bombs or fireworks since the age of thirteen and he had often exploded pop bottles using gunpowder and a Christmas tree light. He admitted that on the weekend of the shooting, he had been making fireworks with copper tubing, steel wool, and gunpowder. He claimed that he had used the quilted materials found in his workshed as shop rags. He had wrapped the quilted material around the copper tubing and secured it with wire because the explosion caused the tubing to heat up, preventing him from handling it. He contended that he set off the fireworks for the victim's enjoyment upon her return from work. When she did not comment and walked inside the house, he followed her, holding the firework. He testified that when the victim asked if he didn't have "anything better to do" with his time, he became angry, dismantled the firework as he left, and dropped the cut wires on the floor. He claimed that he threw the quilted material to the floor near the garbage can in the bathroom.

The defendant testified that on the day before the victim's death, he had gone to Smiley Hollow Road to shoot his .45 pistol. He recalled that when two men drove up and stopped, he was about half way through the clip. The defendant stated that he then uncocked the pistol, placed it in his jeans, and covered it with his shirt. He stated that there would have been one or two bullets in the clip and one in the chamber. After talking with the two men for a few minutes, the defendant left because it had become too dark to shoot. He explained that as he left, he took several bullets from his shirt pocket, placed them in the magazine, and put the magazine in the pistol. He stated that when he arrived home, he placed the pistol in a holster in the bedroom. The victim was about to leave for work. He had arranged for his youngest daughters to spend the night elsewhere so he could talk further with the victim about divorce. He explained that the next morning he left his son, Paul, in town to do some community work.

The defendant testified that on the day of the shooting, he and the victim were in the bedroom to discuss divorce. He claimed that both were

-6-

sitting on the floor when the victim pointed to the defendant's pistol and said, "[W]hat's that thing doing in the house?" He stated that when she directed him to move the weapon from the house, he removed the pistol from the holster, cocked it, and pulled the trigger so as to guide the hammer down slowly with his finger. He claimed that as he did so, he was aiming the pistol toward the television and away from the victim. The defendant contended that he then suddenly experienced a back spasm and instinctively clenched his hand, causing the pistol to discharge in the direction of the victim. He contended that as soon as he was able to move, he crawled to her side to help but found no pulse. The defendant stated that his attempts at CPR were in vain. He acknowledged his failure to call 9-1-1 and claimed that he decided to try to make the death look like a suicide. The defendant decided to detonate a homemade bomb to attract Matt Moss to the room to discover the body but before doing so, he threw an empty cartridge to the floor and rolled the victim onto her side, as she had originally fallen. The defendant then attached an alarm clock as a timer to delay the detonation. The defendant testified that he left the pistol on the floor, loaded and cocked and closed the victim's eyes, apologized, and kissed her forehead. He admitted that as he left, he barred one bedroom door and locked the other behind him. The defendant stated that he wrapped his bloody clothes in newspaper, walked outside, and burned them.

When the bomb exploded, he and his brother walked to the house. He then went to the barred door and yelled for the victim before walking through the bathroom to the other door and breaking inside. The defendant acknowledged that he had a key in his pocket at the time and that he threw his keys on the bed after he entered the room. Because the room was smoky from the bomb explosion, he opened a window, turned on a fan, and unbarred the main door to the bedroom. As his brother called 9-1-1, the defendant placed the alarm clock in a drawer, threw electric wire used to detonate the device in the clothes basket, and shoved the remains of the homemade bomb between the mattress and the box springs. When questioned by the authorities, the defendant claimed that the victim committed suicide. At trial, he admitted that he had lied.

*Moss*, 13 S.W.3d at 380-82.

No application for permission to appeal was filed. Petitioner terminated appellate counsel. Despite the termination of his representation, appellate counsel filed a petition for post-conviction relief on Petitioner's behalf on May 12, 2000, in order to prevent the statute of limitations from expiring. Petitioner sent a letter to the clerk's office, informing them that

they should not consider the petition filed by former appellate counsel. Subsequently, Petitioner himself filed a petition for post-conviction relief on June 1, 2000.[2] Counsel was appointed and an amended petition was filed on May 9, 2001. A different attorney was appointed to represent Petitioner at some point, and new counsel filed a memorandum in support of the petition for post-conviction relief. In the petition for relief, Petitioner alleged: (1) that his conviction was based on the use of tapes that were gained pursuant to an unconstitutional search and seizure; (2) that his conviction was based on a violation of the privilege against self incrimination; (3) that he received ineffective assistance of counsel at trial and on appeal; (4) that his right to remain silent after arrest was used against him at trial violating his right to due process; (5) that he was denied reasonable bond; and (6) that the trial court erred by failing to charge voluntary manslaughter.

The post-conviction court held a hearing on the petition. At the hearing, Petitioner's appellate counsel testified that he had been practicing exclusively in the area of criminal law since 1988. At the time of the post-conviction hearing, appellate counsel informed the court that he had personally handled between three hundred and five hundred appeals.

After the Court of Criminal Appeals issued the opinion on direct appeal from Petitioner's conviction, appellate counsel did not seek permission to appeal from the Tennessee Supreme Court because Petitioner did not authorize him to do so. Appellate counsel mailed a copy of the appellate opinion to Petitioner. Appellate counsel stated that Petitioner did not instruct him on whether to file an application for permission to appeal prior to the expiration of the sixty day period for filing such an application. According to appellate counsel, Petitioner had informed him early on in the representation not to file anything without his permission. Despite this admonition, appellate counsel filed a petition for post-conviction relief on Petitioner's behalf to prevent the statute of limitations from expiring.

Appellate counsel felt that trial counsel had done a "fantastic job getting it out of first degree murder." Appellate counsel was limited in the issues on appeal by the issues that were raised by trial counsel in the motion for new trial.

Appellate counsel recalled that one of the issues in the motion for new trial challenged statements made during the prosecutor's closing statement. Appellate counsel admitted that he did not include the transcript of the closing statement in the record on appeal and did not

_____

[2]There was some issue at the post-conviction hearing as to whether the petition filed by Petitioner was actually untimely. The post-conviction court determined at the beginning of the hearing on the petition that the petition was indeed timely. The record revealed that the petition was signed, notarized and delivered to the appropriate person at the jail on May 28, 2000, within the time set for filing under Tennessee Rule of Criminal Procedure 49(d)(1).

pursue this issue because he did not believe it had merit. Trial counsel had failed to object during the closing statement, so appellate counsel explained that any issue regarding the closing statement would be waived on appeal unless there was plain error. Appellate counsel further explained that it was a challenge to win an issue on the basis of plain error. Additionally, appellate counsel felt that supplementing the record with the closing statements would slow down the appeal process and would be looked at in disfavor by the appellate court.

Petitioner's uncle, Wayne Moss, testified that Petitioner contacted him after his arrest and asked him to go to the shed behind his house to retrieve his tape recorder. Mr. Moss went to the house but did not go to the shed because it was surrounded with crime scene tape. When the police finally vacated the area, Mr. Moss went to the shed. The padlock that Petitioner kept on the door was missing, and the shed was in disarray.

Petitioner testified at the hearing. Petitioner's trial counsel failed to file a motion to suppress the audio tapes at trial. According to Petitioner, about 90% of the tapes were presented to the jury at trial. Petitioner insisted that there was no motion to suppress the audio tapes that were given to the police by Cherl McSwain, the victim's sister. Trial counsel just informed Petitioner that the tapes were admissible. Petitioner claimed that had the tapes not been admitted, he would have chosen not to testify.

Petitioner felt that he was in constructive possession of them through his uncle and that he had an expectation of privacy in the journals. Petitioner testified that Ms. McSwain searched the shed with the sole intent of finding evidence against him like the case of *Walter v. United States*, 447 U.S. 649 (1980).[3] Petitioner felt that Ms. McSwain was going into the shed acting as an agent for the police. She knew that Petitioner was the sole person to use the shed and had no reason to enter the building.

Petitioner insisted to the post-conviction court that there were several inaccuracies in the transcript of the closing statements at trial. For instance, Petitioner asserted that trial counsel should have objected when "Assistant District Attorney James W. Kirby"[4] commented on his decision to remain silent after his arrest and when he talked about the instances of sexual misconduct involving Petitioner and his daughter.

---

[3]Petitioner referred to the case as "*U.S. v. Walker*."

[4]The rebuttal closing argument was actually made by the other prosecutor that was representing the State.

Petitioner admitted that he did not instruct appellate counsel to file an application for permission to appeal to the supreme court. Petitioner did not learn of the decision on direct appeal until after he contacted the clerk of the court. Within ten days of contacting the clerk, Petitioner received a copy of the appellate opinion from appellate counsel.

Lieutenant Donald Bennett of the Robertson County Sheriff's Office testified at the post-conviction hearing. He received the audio tape diary from Ms. McSwain on January 23, 1995. Lieutenant Bennett testified that he had no prior knowledge of the tapes and had no idea that Ms. McSwain was going to the residence to obtain the tapes for the State.

According to Lieutenant Bennett, the police had conducted a search of the shed as well as Petitioner's car and home. He could not recall if they had discovered an audio tape during the search. In total, three searches were performed on Petitioner's home. Two of the searches were pursuant to a warrant and one was by consent. As far as Lieutenant Bennett knew, the crime scene tape was not removed after the police investigation was concluded in order to deter people from entering the property.

Ms. McSwain testified that she came to Tennessee from her residence in Florida on January 16, 1995. Ms. McSwain went to Petitioner's house to locate the victim's insurance policy on either January 18 or 20 of 1995 with her niece. Ms. McSwain returned to the house the following weekend to find the victim's will. Her niece accompanied her on this trip to retrieve some of her personal belongings from the house.

Ms. McSwain had to return to the house several times because Petitioner's uncle kept giving her a key that did not work. Finally, Petitioner's son provided her with a working key. According to Ms. McSwain, the shed was open and did not have a lock. She found the tapes when she was searching for the will and insurance policies. One of the tapes was in a drawer and the other tape was on the floor. Ms. McSwain insisted that she did not have an agreement with law enforcement to look for evidence. She specifically denied going to the house to look for evidence.

Trial counsel testified that he represented Petitioner at trial. In his assessment, the two had a good relationship. Trial counsel actually described it as the "best" communication that he had ever had with a client. Trial counsel described himself as prepared for Petitioner's trial and felt that he did not challenge the searches because he had examined the warrants and did not find a basis for filing a motion. Further, trial counsel explained that there was no basis on which to challenge the tapes because they were not seized by the police. Trial counsel did explain that he objected to the tapes on the basis that they were irrelevant or in violation of Tennessee Rule of Evidence 404.

Trial counsel stated that he requested an instruction on voluntary manslaughter as a lesser included offense at trial. The request was denied because there was no basis to support the instruction. Trial counsel stated that his strategy at trial was to avoid objecting as much as possible because he feels like it draws the jury's attention to the objectionable testimony. Trial counsel did not object during closing argument because he felt that it would cause problems for the client. According to trial counsel, the theory of the defense was that the shooting was accidental and he wanted the jury to make the determination based on the evidence.

After hearing the evidence at the post-conviction hearing, the post-conviction court denied relief. Specifically, the post-conviction court determined that "there was no evidence to show that [Ms. McSwain] was acting any other way then [sic] on her own." In other words, the post-conviction court found that there was no evidence that the tapes were illegally seized. Further, the post-conviction court determined that the admissibility of the tapes was not a violation of Petitioner's right against self-incrimination. Petitioner "just has a misplaced perception of what the law is with regard to the admissibility of those matters." Similarly, the post-conviction court found that Petitioner's argument with regard to the denial of bond was "not justified under the law" because Petitioner actually did make bond and was "surrendered by the bonding company." Next, the post-conviction court found that there was no evidence to support the charge of voluntary manslaughter. The post-conviction court found that Petitioner received effective assistance of counsel at trial and on appeal. Specifically, Petitioner failed to show clear and convincing evidence that any action or inaction of his trial or appellate counsel constituted a deficiency.

Petitioner filed a timely notice of appeal challenging the denial of post-conviction relief.

*Analysis*
*Post-Conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely

de novo standard with no presumption of correctness. *See Shields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, Petitioner claims that he received ineffective assistance of counsel because trial counsel failed to file a motion to suppress the audio tapes and appellate counsel failed to allege that the trial court erred in not declaring a mistrial or striking a portion of the State's closing argument. Petitioner raised other instances of ineffective assistance of counsel in his petition but has abandoned those allegations on appeal.

-12-

*Failure to File Motion to Suppress*

Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to file a motion to suppress the audio tapes. He maintains that the tapes were the result of an illegal search and seizure and that Ms. McSwain was acting as an agent for law enforcement when she searched the property.

The facts indicated that the property was searched three times pursuant to two search warrants and one consensual search. When Ms. McSwain came to retrieve a copy of the victim's will and insurance policies, she found the tapes and turned them over to law enforcement. The police had no knowledge of the existence of the tapes prior to receiving them. Trial counsel felt that there was no basis for a motion to suppress because the tapes were not seized by the police.

The post-conviction court determined that the decision to forgo a motion to suppress was a tactical decision made by trial counsel after preparation for the case. Again, we will not second-guess a reasonably-based trial strategy that is made after adequate preparation for the case. *Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528. Further, Petitioner has failed to show that the motion to suppress would have been granted or that there is a reasonable probability that the proceedings would have concluded differently had counsel performed the suggested task. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 687). The evidence does not preponderate against the determination of the post-conviction court.

*Failure of Appellate Counsel to Object*

Petitioner also claims that he received ineffective assistance of counsel because appellate counsel failed to object when the trial court did not declare a mistrial or strike a portion of the prosecutor's closing argument. Petitioner refers to the portion of the closing argument in which "Mr. Morriss" stated that "he only prosecutes guilty people." The State notes that "Mr. Morriss" was not one of the State's attorneys and the transcript does not contain such a statement.

As the State notes, Petitioner fails to point to this portion of the argument in the transcript. The evidence at the post-conviction hearing indicates that appellate counsel did not feel that this issue would be successful on appeal, if indeed there was such a statement by "Mr. Morriss." In other words, appellate counsel made a tactical decision not to raise the issue on appeal. Appellate counsel is not constitutionally required to raise every conceivable issue on appeal. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). In fact, such decisions are generally within the discretion of appellate counsel when the "choices are

-13-

within the range of competence required of attorneys in criminal cases." *Id.* Petitioner has failed to demonstrate that this issue would have been successful on appeal. In other words, he failed to prove this claim by clear and convincing evidence. This issue is without merit.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.


_____
JERRY L. SMITH, JUDGE