[Cite as *State v. Moscoso*, 2018-Ohio-2877.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff - Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, J. |
| -vs- | : | |
| | : | |
| REMBER Y. MOSCOSO | : | Case No. CT2018-0012 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Muskingum County
                                  Court of Common Pleas, Case No.
                                  CR2017-0271

JUDGMENT:                         Affirmed

DATE OF JUDGMENT:                 July 19, 2018

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

D. MICHEAL HADDOX                         JAMES A. ANZELMO
Prosecuting Attorney                      Anzelmo Law
                                          446 Howland Drive
By: GERALD V. ANDERSON II                 Gahanna, Ohio 43230
Assistant Prosecuting Attorney
27 North Fifth St., P.O. Box 189
Zanesville, Ohio 43702-0189

*Baldwin, J.*

**{¶1}** Defendant-appellant Rember Moscoso appeals his conviction and sentence from the Muskingum County Court of Common Pleas on drug-related charges. Plaintiff-appellee is the State of Ohio.

## STATEMENT OF THE FACTS AND CASE

**{¶2}** On April 9, 2017, the Muskingum County Grand Jury indicted appellant on one count of possession of drugs (methamphetamines) in violation of R.C. 2925.11(A), a felony of the first degree. The count was accompanied by forfeiture and major drug offender specifications. Appellant also was indicted on one count of trafficking in drugs (methamphetamines) in violation of R.C. 2925.03(A)(2), a felony of the first degree, with major drug offender and forfeiture specifications and one count of fabrication of a vehicle with a hidden compartment in violation of R.C. 2923.241(C), a felony of the second degree. Because appellant was determined to be indigent, the trial court appointed counsel to represent him. At his arraignment on August 16, 2017, appellant entered a plea of not guilty to the charges.

**{¶3}** On October 11, 2017, appellant filed a Motion to Suppress Evidence, seeking to suppress "any and all evidence obtained in the course of, as a result of, and subsequent to, the arrest of Defendant and the search of his hotel room…" Appellant argued, in part, that the search of his hotel room was improper due to lack of consent and/or lack of a search warrant. Appellee filed a response to the Motion to Suppress on October 24, 2017. A suppression hearing was held on November 10, 2017.

**{¶4}** At the hearing, Detective Adam Hoskinson of the Licking County Sheriff's Office testified that he was assigned to the Central Ohio Drug Enforcement ("CODE")

Task Force. He testified that on July 11, 2017, he was in a marked cruiser when he noticed a vehicle following too close to a gasoline tanker truck in front of it. He testified that the vehicle later changed lanes but did not "signal for at least 100 feet" before it did so. Transcript of November 10, 2017 hearing at 15. Detective Hoskinson testified that he initiated a traffic stop of the vehicle which was a silver Kia Sportage with Illinois plates which had been rented from Enterprise Rent-A-Car in the name of Amber Connor. The following testimony was adduced when he was asked if the registration came back with anything of note to him:

**{¶5}** A: …[T]he Illinois plate, it came back as a rental vehicle. Rental vehicles have stickers, they are like bar codes on them usually in several places. Typically either the front window, the side passenger window, or on the rear window. I did not see any of these stickers on the vehicle, so that raised a lot of suspicions to me like why is that; and with my training and education, it tells me that a lot of the times the drug traffickers, drug couriers will remove those stickers to make it appear that somebody actually is private ownership of the vehicle to blend in with traffic.

**{¶6}** Q: Okay. Through your training and experience, do drug couriers oftentimes use rental vehicles?

**{¶7}** A: Yes, they like to use rental cars, one, because of the seizure clause, if they get caught. Two, they are dependable cars, you know, they would rather drive a 2016, 2017 car over 2005 or 2010 because they are newer and more dependable, and they blend in better.

**{¶8}** Transcript of November 10, 2017 hearing at 16.

{¶9} After he pulled the vehicle over and approached the passenger's side, Detective Hoskinson immediately smelled an "odor, abundant amount of raw marijuana coming from inside the vehicle" Transcript of November 10, 2017 hearing at 16-17. He testified that he could observe marijuana flakes throughout the center console area of the vehicle. The driver of the vehicle, Jose DeJesus Barragan Buenrostro, consented to a search of the same and of his person and had flakes of marijuana on his shirt and pants. The Detective located three hotel key cards to the Quality Inn in Zanesville, Ohio on Buenrostro's person. A search of the vehicle yielded a Quality Inn hotel receipt for room 324 in the hotel which was in Zanesville, Ohio. The name on the receipt was appellant Rember Moscoso. A large bag with two or three ounces of suspected marijuana was found in the center console. When he opened up the rear cargo area of the Kia, Detective Hoskinson located a spare tire sitting on the carpeted area and noticed that the lug pattern on the spare tire was for four lugs when the tires on the vehicle had five lugs. Because he was concerned that there could be a hidden compartment in the tire, he examined the tire and saw that there was a rectangular cut with a flap sticking up on the tire. He testified that this was a common way of transporting illegal narcotics or contraband. There was nothing inside the compartment, but a residue of methamphetamine was later found inside the tire. Also in the vehicle, a traffic citation from Oklahoma City that had been issued in the name of Hector Gomez was located. Buenrostro, who did not have a driver's license, was arrested on an outstanding ICE holder and the hidden compartment violation.

{¶10} Detective Hoskinson then contacted Detective Mike Patrick with the Zanesville Police Department who is also a Detective with the Zanesville/Muskingum

County Drug Unit to follow up with the hotel because he thought that there might be drugs in the hotel room.   Detective Todd Kanavel of the Muskingum County Sheriff's Office who is also an agent with CODE, testified that he followed up with the hotel at the direction of Detective Patrick. He testified that the hotel manager told him that appellant had checked into room 324 on July 8, 2017 but had transferred to room 210 on July 11, 2017 to save money. Detective Kanavel and Detective Patrick then went to room 210 at approximately 3:30 p.m. on July 11, 2017 and knocked on the door.  They could hear at least one male voice inside the room talking. Detective Kanavel identified himself and Detective Patrick to appellant and asked to talk to him. Appellant, according to Detective Patrick, invited them into the room. When the Detectives entered the room, they saw Hector Gomez also was in the room laying on the bed. Both Gomez and appellant provided California IDs. Appellant already knew about Buenrostro's arrest and asked if this had anything to with their friend Jose, who had been arrested with the marijuana.  The Detectives indicted that it did and appellant said that the marijuana in the car was all that they had, Detective Kanavel testified that both men, when asked indicated that they did not have any drugs or guns in the room and when he asked them individually if they could check through the room for guns and drugs they consented. Approximately $15,000 in U.S. currency was located in a black bag that appellant later identified as his.  Appellant stated that the money was used to pay MMA (mixed martial arts) fighters. The two men told Detective Kanavel that they had flown from California into Akron on July 10, 2017 looking for MMA fighters. The Detective, however, knew that this was a lie because they had checked into the hotel on July 8th.  Appellant also claimed that, in Akron, a woman named Amber met them and rented a car for them.

**{¶11}** Detective Kanavel testified that the amount of money found concerned him, so he contacted Detective Romano of the Newark Police Department who was with CODE. He then told the two men that Detective Romano wanted to talk to them and they said that it would not be a problem. Neither man objected to the Detectives remaining in the room while waiting the 30 to 45 minutes that it would take for Detective Romano to arrive from Newark. When Detective Romano arrived, he spoke with appellant and Gomez individually. The two gave conflicting stories about how and when they traveled to Ohio. Both men were then arrested for further investigation into the marijuana that was located in the car. When they were asked if they wanted the Detectives to clear out all of their stuff and put it into bags so that they could get their $250.00 hotel deposit back and have the stuff transported to Licking County along with them, where further investigation was to be conducted, the two men agreed and the Detectives started gathering their belongings. As they were gathering up the belongings, Detective Romano found an unzipped black duffle bag full of methamphetamine under one of the beds that appellant had been sitting on. The methamphetamine was in 13 gallon-size zip lock bags. When asked, he testified that the men never revoked his permission to be in the room or their consent for him to search for anything. Romano testified that in a cabinet behind a microwave, he found a styrofoam coffee cup containing what looked like methamphetamine.

**{¶12}** The trial court, as memorialized in a Journal Entry filed on November 16, 2017, denied the Motion to Suppress, holding, in part, that the occupants of the hotel room gave consent to search the room and that no coercive tactics were used and "no claims of false authority made."

{¶13} Thereafter, on November 28, 2017, appellant entered a plea of no contest to possession of drugs and trafficking in drugs and the specifications and the trial court found appellant guilty. The charge of fabrication of a vehicle with a hidden compartment was tried to the bench. No testimony was taken, but rather the parties stipulated to the facts. The parties stipulated that Detective Hoskinson stopped Jose Barragan Buenrostro on July 11, 2017 for a traffic violation and found an altered tire in the cargo section of the vehicle driven by him. They stipulated that the spare tire located in the vehicle did not match the lug pattern on the vehicle and that there was "a purposeful cut …in the outside of the discovered tire giving access to its interior.   ..Inside the cut tire was methamphetamine residue". Transcript from November 28, 2017 at 48. The parties also stipulated that the Detectives discovered a plastic baggie containing marijuana in the center console of the vehicle and that a baggie was found stowed in the trunk compartment where the spare tire normally would have been. There was a stipulation that "Detectives Hoskinson, Romano, Kanavel, and Patrick would testify that this baggie would match the type characteristics of the baggies of methamphetamine later discovered in Zanesville and for which the defendants have already pled no contest." Transcript from November 28, 2017 at 49. The parties also stipulated that the phone found on Barragan contained videos containing recorded conversations between Barragan and appellant and Gomez about methamphetamine. The trial court found appellant guilty of the fabrication of a vehicle with a hidden compartment charge.

{¶14} Appellant on January 29, 2018, filed a Motion to Waive Mandatory Fine due to indigency. Pursuant to an Entry filed on January 31, 2018, the trial court ordered that for purposes of sentencing, Counts One and Two would merge and appellant would be

sentenced under Count Two, and sentenced appellant to a mandatory term of eleven years and imposed mandatory fine of $10,000.00 and a to stated prison term of four years on Count Three. The trial court ordered that the prison sentences be served consecutively with each other for an aggregate prison sentence of 15 years. The trial court also ordered appellant to pay all court costs.

{¶15} Appellant now raises the following assignments of error on appeal:

{¶16} I.  THE TRIAL COURT ERRED BY DENYING MOSCOSCO' S MOTION TO SUPPRESS EVIDENCE THAT POLICE OBTAINED IN VIOLATION OF HIS RIGHT AGAINST UNREASONABLE SEARCHES AND SEIZURES GUARANTEED BY THE FOURTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 14, ARTICLE I OF THE OHIO CONSTITUTION.

{¶17} II. MOSCOSCO' S  CONVICTION FOR FABRICATION OF A VEHICLE WITH A HIDDEN COMPARTMENT IS BASED ON INSUFFICIENT EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 1 AND 16, ARTICLE 1 OF THE OHIO CONSTITUTION.

{¶18} III. THE TRIAL COURT UNLAWFULLY ORDERED MOSCOSO TO SERVE CONSECUTIVE SENTENCES, IN VIOLATION OF HIS RIGHTS TO DUE PROCESS GUARANTEED BY SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITES STATES CONSTITUTION.

{¶19} IV. THE TRIAL OUR ABUSED ITS DISCRETION BY ORDERING MOSCOSCO TO PAY A FINE, IN VIOLATION OF HIS DUE PROCESS RIGHTS UNDER

THE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE 1 OF THE OHIO CONSTITUTION.

**{¶20}** V.  THE TRIAL COURT ERRED BY ORDERING MOSCOSO TO PAY COSTS, IN VIOLATION OF HIS DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16 ARTICLE I OF THE OHIO CONSTITUTION.

I

**{¶21}** Appellant, in his first assignment of error, argues that the trial court erred in denying his Motion to Suppress. We disagree.

**{¶22}** There are three methods of challenging a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning,* 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein,* 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *State v. Williams,* 86 Ohio App.3d 37, 619 N.E.2d 1141 (1993). Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry,* 95 Ohio

App.3d 93, 641 N.E.2d 1172 (8th Dist. 1994); *State v. Claytor,* 85 Ohio App.3d 623, 620 N.E.2d 906 (4th Dist. 1993); *Guysinger, supra.* As the United States Supreme Court held in *Ornelas v. U.S.,* 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996), "... as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. See *State v. Dunlap,* 73 Ohio St.3d 308, 314, 1995–Ohio–243, 652 N.E.2d 988; *State v. Fanning,* 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982).

**{¶23}** Appellant argues that his consent was not voluntary but was submission to police authority and that Romano's search exceeded the consent. Because appellant challenges the trial court's decision regarding the ultimate issue raised in his motion to suppress; we must independently determine whether the facts meet the appropriate legal standard.

**{¶24}** It is well-established a defendant waives his or her Fourth Amendment protection by consenting to a warrantless search. *State v. Barnes,* 25 Ohio St.3d 203, 208, 495 N.E.2d 922 (1986), citing *Davis v. United States,* 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946), *Schneckloth v. Bustamonte* , 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), "The standard of proof to show a waiver of Fourth Amendment rights is less strict than that required to demonstrate a waiver of Fifth or Sixth Amendment rights. It need not be shown that there has been a knowing and intelligent waiver. Rather, the court must examine the totality of the circumstances to determine the voluntariness of

consent." *Barnes,* supra, at 208-209,   citing *Schneckloth,* supra, and *United States v. Mendenhal*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

**{¶25}**  "Voluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search." *State v. Robinette*, 80 Ohio St.3d 234, 241, 1997 Ohio 343, 685 N.E.2d 762, citing *Davis v. United States, supra,* at 593-594. Important factors in determining the voluntariness of consent are: (1) The voluntariness of the defendant's custodial status; (2) The presence of coercive police procedures; (3) The extent and level of the defendant's cooperation with the police; (4) The defendant's awareness of his right to refuse to consent; (5) The defendant's education and intelligence; and (6) The defendant's belief that no incriminating evidence will be found. *State v. Hall*, Tuscarawas App. Nos.2000AP030025, 2000AP030026,  unreported, 2000 WL 1862650 #3 (Dec. 14, 2000), citing *State v. Webb*, 2nd Dist. No. 17676, 2000 WL 84658 unreported (Jan. 28, 2000).

**{¶26}** Any search beyond the permitted intrusion would not be based on a voluntary relinquishment of the right to be free from warrantless searches. See *State v. Mack* , 118 Ohio App.3d 516, 519, 693 N.E.2d 821 (1997), appeal not allowed (1997), 79 Ohio St.3d 1418, 680 N .E.2d 156. And if an individual may limit the scope of his consent to search, he may revoke that consent entirely. See, e.g., *United States v. Drayton,* 536 U.S. at 207, 122 S.Ct. 2105, 153 L.Ed.2d 242; *Painter v. Robertson* (C.A.6, 1999), 185 F.3d 557, 567. Of course, an item properly seized prior to the withdrawal of consent is not subject to suppression under the Fourth Amendment. *State v. Riggins,* 1st Dist. No. C0306262, 2004-Ohio-4247.

**{¶27}** The prevailing rule among Ohio courts is that consent to a search may be limited in time, duration, area, and intensity, or may revoked at any time, even after the search has begun. See *Lakewood v. Smith*, 1 Ohio St.2d 128, 130, 205 N.E.2d 388 (1965); *State v. Crawford,* 151 Ohio App.3d 784, 2003-Ohio-902, 786 N.E.2d 83 (2d Dist.); *State v. Mack,* 118 Ohio App.3d at 519, 693 N.E.2d 821 (6th Dist.); *State v. Rojas* (1997), 92 Ohio App.3d 336, 635 N.E.2d 66 (8th Dist.); *State v. Arrington* (1994), 96 Ohio App.3d 375, 645 N.E.2d 96 (12th Dist.).

**{¶28}** Whether a search is authorized by warrant or by consent, the scope of the search is limited by the terms of its authorization. See *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). See also, *State v. Robinson,* 103 Ohio App.3d 490, 495, 659 N.E.2d 1292. Where a suspect places express limitations on the scope of a consensual search, those limitations must be observed. For example, where a suspect tells the police, "The search is over. I am calling off the search," his consent has been revoked. *United States v. Dichiarinte,* 445 F.2d 126, 128-29 (C.A.7, 1971). A suspect may also communicate the limitation of a search by his actions. Where a suspect voluntarily opens his door to the police but then closes the door, barring the officers' progress into his apartment, he has communicated the withdrawal of his consent to the initial intrusion. See *State v. Robinson,* 103 Ohio App.3d 490, 495, 659 N.E.2d 1292 (1995).

**{¶29}** The scope of an individual's consent is often not as readily discernible and is not to be determined by the subjective belief of the suspect. Rather, "[t]he standard for measuring the scope of a suspect's consent is that of 'objective reasonableness 'what would the typical reasonable person have understood by the exchange between the

officer and suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (citations omitted).

**{¶30}** The scope of a search is defined by its expressed purpose or by the nature of the object being sought. See *id.,* citing *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); see, also, *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County,* 542 U.S. 177, 124 S.Ct. at 2457-2458.

**{¶31}** At the suppression hearing, there was testimony that Detective Kanavel knocked on the door to room 201 of the hotel at approximately 3:30 p.m. on July 11, 2017 and that appellant opened the door. Both Detective Kanavel and Detective Patrick were outside the door and identified who they were and Detective Kanavel testified that he asked appellant if he could talk with him. The detectives testified that once appellant consented and said for them to come on in, they went into the room, shut the door, and appellant "said does this have anything to do with Jose [DeJesus Buenrostro], and I told him yes." Transcript of suppression hearing at 71. Hector Gomez was also in the room at the time. Both men told the Detectives that they did not have any other drugs in the room or guns and when each was asked individually if they cared if the Detectives "would check through the room for guns and drugs and they stated no, it was no problem." Transcript of suppression hearing at 59.

**{¶32}** Detective Kanavel testified that he saw a black bag that appellant identified as being his and that he located approximately $15,000 in U.S. currency in the bag. While he was searching the bag, Detective Patrick was searching Gomez's stuff on the other side of the room. Appellant and Gomez were advised that Detective Romano with CODE wanted to talk to them further because of the money that had been located and that when

asked if that was a problem, they both indicted that it was not. Detective Kanavel testified that he asked if they cared if "We just hang out here with you until he gets here, they stated that it would be no problem, so we sat there in the room for probably about 40, 45 minutes watching ESPN, talking sports, and talking about the MMA fighting and that." Transcript of suppression hearing at 62.  When he told them that it would take a half hour to 35 minutes because Detective Romano was in Licking County and that it would take a while, the two men did not complain and were friendly. Once Detective Romano arrived, both men agreed to be individually interviewed by him along with Detective Patrick. At the time no one was handcuffed and guns were not pointed at anyone.  Detective Kanavel testified that the consent to search the room for drugs and guns was started at 3:35 p.m. and that during the course of the search, both men identified what possessions in the room belonged to them. The consent search ceased at approximately 3:40 p.m. The following is an excerpt from Detective Kanavel's testimony at the suppression hearing**:**

**{¶33}** Q:  Okay.  At any point when you were talking to these guys, did they revoke your permission to be in the same room?

**{¶34}** A:  No, they did not.

**{¶35}** Q:  Did they ever revoke their consent for you to be searching for anything?

**{¶36}** A:  No.

**{¶37}** Q:  Did you refresh your permission repeatedly throughout this interaction?

**{¶38}** A:  Yes.

**{¶39}** Q:  At the end when you were - - when they were being placed under arrest in the room and they were going to be taken to Licking County, and you asked to get their stuff and put it in a bag –

**{¶40}** A: Yes.

**{¶41}** Q: - - was it your purpose to be rooting around the room and finding drugs, or were you just trying to get their stuff in a bag and get them out of there?

**{¶42}** A: Just gather all their stuff.

**{¶43}** Q: So if somebody gives you permission to gather all their stuff in a hotel room so it could be taken with them, do they take that to mean clear out the hotel room of all the personal property?

**{¶44}** A: Yes.

**{¶45}** Q: Not just the specific bags that they have pointed out, but instead all personal property?

**{¶46}** A: Correct.

**{¶47}** Transcript of suppression hearing at 102-103.

**{¶48}** Based on the foregoing, we find that the trial court did not err in finding that the consent to search was "voluntary, uncoerced and valid" and that the detectives "[c]ontinually refreshed the voluntariness of the encounter, and continued to meet with complete cooperation from the Defendant [appellant] and co-defendant which cements the voluntariness of the consensual interaction of the parties." There is no evidence that the scope of consent was ever limited or revoked by either appellant or Gomez at any time. As noted by appellee, the Detectives had clear consent to gather the belongings of the two men in the hotel room so that they could get back their $250.00 deposit when the room was vacated. Both the cup containing drugs and the bag containing money were discovered as a result of this "gathering".

**{¶49}** We find, therefore, that the trial court did not err in denying the Motion to Suppress.

**{¶50}** Appellant's first assignment of error is, therefore overruled.

II

**{¶51}** Appellant, in his second assignment of error, contends that his conviction for fabrication of a vehicle with a hidden compartment is based on insufficient evidence.

**{¶52}** In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. It is well-established that the State bears the burden of establishing each and every element of a charged crime and must do so with proof beyond a reasonable doubt. *See In re L.R.*, 8th Dist. Cuyahoga No. 93356, 2010–Ohio–15, 2010 WL 27862, ¶ 11.

**{¶53}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 231, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260, 674 N.E.2d 1159.

**{¶54}** Appellant was convicted of designing or operating a vehicle with a hidden compartment used to transport a controlled substance in violation of R.C. 2923.241(C). R.C. 2923.241 states, in relevant part, as follows**:**

(A)     As used in this section:

(1)     "Controlled substance" has the same meaning as in section 3719.01 of the Revised Code.

(2)     "Hidden compartment" means a container, space, or enclosure that conceals, hides, or otherwise prevents the discovery of the contents of the container, space, or enclosure. "Hidden compartment" includes, but is not limited to, any of the following:

(a)     False, altered, or modified fuel tanks;

(b)     Any original factory equipment on a vehicle that has been modified to conceal, hide, or prevent the discovery of the modified equipment's contents;

(c)     Any compartment, space, box, or other closed container that is added or attached to existing compartments, spaces, boxes, or closed containers integrated or attached to a vehicle.

(3)     "Vehicle" has the same meaning as in section 4511.01 of the Revised Code and includes, but is not limited to, a motor vehicle, commercial tractor, trailer, noncommercial trailer, semitrailer, mobile home, recreational vehicle, or motor home.

(4)     "Motor vehicle," "commercial trailer," "trailer," "noncommercial trailer," "semitrailer," "mobile home," "manufacturer," "recreational vehicle," and "motor home" have the same meanings as in section 4501.01 of the Revised Code.

(5)     "Motor vehicle dealer" has the same meaning as in section 4517.01 of the Revised Code.

(B)     No person shall knowingly design, build, construct, or fabricate a

vehicle with a hidden compartment, or modify or alter any portion of a

vehicle in order to create or add a hidden compartment, with the intent to

facilitate the unlawful concealment or transportation of a controlled

substance.

(C)     No person shall knowingly operate, possess, or use a vehicle with a

hidden compartment with knowledge that the hidden compartment is used

or intended to be used to facilitate the unlawful concealment or

transportation of a controlled substance.

**{¶55}** In the case sub judice, there was testimony that a spare tie with a three-sided flap cut into the sidewall was located in the vehicle.  It was placed inside the vehicle to make it appear that it was the correct spare tire for the vehicle. The cut, according to the testimony, appeared to be purposeful and not the result of a non-deliberate cause. There was drug residue found inside the tire.

**{¶56}**   A spare tire clearly falls under the original factory equipment of a vehicle even though, as noted, the spare at issue was not the actual spare from the Kia in this case. The spare tire to the vehicle in question was removed and replaced with the spare tie that was found in the vehicle. As noted by appellee, "[t]he cut located on the underside of the spare tire in the vehicle was consistent with the creation of a hidden compartment under the statute."  The trial court, at the conclusion of the bench trial, stated on the record, in relevant part, as follows:

**{¶57}** THE COURT:  The Court does find that the tire specifically is - - does provide a hidden compartment and is the hidden compartment as stated in 2923.241 (2)

and (B) says any original factory equipment on the vehicle that has been modified to conceal, hide, or prevent the discovery of modified equipment's contents. Clearly, the methamphetamine or drugs were placed inside that they modified with the slices, it was intended to hide the drugs inside.

Because the tire was sitting on top of the spare tire area doesn't mean that tire wasn't designed - - that tire still was designed to conceal the drugs.

And based upon that, I find you guilty of Count 3 also.

**{¶58}** Transcript from November 28, 2017 at 80.

**{¶59}** Based on the foregoing, we find that after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that appellant knowingly operated, possessed, or used a vehicle with a hidden compartment with knowledge that the hidden compartment was used or intended to be used to facilitate that unlawful concealment or transportation of a controlled substance,

**{¶60}** Appellant's second assignment of error is, therefore, overruled.


III

**{¶61}** Appellant, in his third assignment of error, argues that the trial court erred in sentencing him to consecutive sentences in contravention of R.C. 2929.14(C)(4). Appellant specifically contends that the record does not support consecutive sentences.

**{¶62}** R.C. 2929.14(C)(4) concerns the imposition of consecutive sentences. Appellant was sentenced to eleven years in prison on Count 2 and four years in prison on Count 3. The trial court ordered that the sentences run consecutively, for an aggregate

prison sentence of 15 years. We note that Counts 1 and 2 merged for purposes of sentencing and that the State of Ohio elected to proceed with sentencing on Count 2.

**{¶63}** In Ohio, there is a statutory presumption in favor of concurrent sentences for most felony offenses. R.C. 2929.41(A). The trial court may overcome this presumption by making the statutory, enumerated findings set forth in R.C. 2929.14(C)(4). *State v. Bonnell,* 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.3d 659, ¶ 23. This statute requires the trial court to undertake a three-part analysis. *State v. Alexander,* 1st Dist. Nos. C–110828 and C–110829, 2012–Ohio–3349, 2012 WL 3055158, ¶ 15.

**{¶64}** R.C. 2929.14(C)(4) provides as follows**:**

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a)     The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b)     At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single

prison term for any of the offenses committed as part of any of the courses

of conduct adequately reflects the seriousness of the offender's conduct.

(c)      The offender's history of criminal conduct demonstrates that

consecutive sentences are necessary to protect the public from future crime

by the offender.

**{¶65}** Thus, in order for a trial court to impose consecutive sentences the court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. The court must also find that consecutive sentences are not disproportionate to the offender's conduct and to the danger the offender poses to the public. Finally, the court must make at least one of three additional findings, which include that (a) the offender committed one or more of the offenses while awaiting trial or sentencing, while under a sanction imposed under R.C. 2929.16, 2929.17, or 2929.18, or while under post-release control for a prior offense; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the seriousness of the offender's conduct; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. *See, State v. White*, 5th Dist. Perry No. 12–CA–00018, 2013–Ohio–2058, 2013 WL 2152488, ¶ 36.

**{¶66}** Recently, in *Bonnell*, supra, syllabus, the Supreme Court of Ohio stated that:

{¶67} In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings.

{¶68} Furthermore, the sentencing court is not required to recite "a word-for-word recitation of the language of the statute." *Bonnell*, ¶ 29. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." Id. A failure to make the findings required by R.C. 2929.14(C)(4) renders a consecutive sentence contrary to law. *Bonnell,* ¶ 34. However, a trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a *nunc pro tunc* entry to reflect what actually occurred in open court. *Bonnell,* ¶ 30.

{¶69} The trial court, in the case sub judice, stated on the record in sentencing appellant to consecutive sentences:

{¶70} The Court does find that consecutive sentences are necessary to protect the public and punish the offender.  But consecutive sentences are not disproportionate to the seriousness of the conduct and the danger posed to the public by your actions.

{¶71} Additionally, at least two of these multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of these courses of conduct adequately reflects the

seriousness of your conduct, therefore, the 15-year prison sentence. Transcript of suppression hearing at 102-103.

**{¶72}** While appellant argues that the record does not support the trial court's findings, we disagree. Appellant was caught with 57,000 unit doses, or 12.2 pounds of crystal methamphetamine. There was evidence at the sentencing hearing that appellant had a prior conviction for felony possession of cocaine in California and an outstanding warrant for obstructing official business through falsification in Texas.  The trial court, at the sentencing hearing, noted that by appellant's own admission, he was making at least $20,000.00 a month in the drug trade in California. There was also evidence that appellant had a conviction for driving without a license from 2014.

**{¶73}** Based on the foregoing, we find that the trial court's findings for imposing consecutive sentences were supported by the record and that the trial court did not err in imposing consecutive sentences.

**{¶74}** Appellant's third assignment of error is, therefore, overruled.

IV

**{¶75}** Appellant, in his fourth assignment of error, challenges the trial court's imposition of a mandatory fine of $10,000.00 on appellant with respect to County Two, a felony of the first degree. Specifically, Appellant claims that the trial court did not consider appellant's indigent status.

**{¶76}** R.C. 2929.18 governs the imposition of financial sanctions as a part of sentencing in felony cases. Specifically, R.C. 2929.18(A) (3) (a) permits the imposition of a fine not more than twenty thousand dollars for a felony of the first degree. Prior to

imposing such a financial sanction, the court must consider, "the offender's present and future ability to pay the amount of the sanction or fine." R.C. 2929.19(B) (5).

**{¶77}** The decision to impose or waive a fine rests within the sound discretion of the court and will not be reversed on appeal absent an abuse of that discretion. *State v. Gipson*, 80 Ohio St.3d 626, 634, 1998-Ohio-626, 687 N.E.2d 750. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶78}** As this Court stated in *State v. Gornall,* 5th Dist. Ashland  No. 2004-COA-002, 2016-Ohio-7599 at paragraph 46:

**{¶79}** As this Court explained in *State v. Perry,* 5th Dist. Ashland  No.2004-CA-00066, 2005-Ohio-85:

" '[T]here are no express factors that must be taken into consideration or findings regarding the offender's ability to pay that must be made on the record.' *State v. Martin,* 140 Ohio App.3d 326, 338, 747 N.E.2d 318, 2000-Ohio-1942. Although a court may hold a hearing under R.C. 2929.18(E) 'to determine whether the offender is able to pay the [financial] sanction or is likely in the future to be able to pay it,' a court is not required to do so. *State v. Stevens* (Sept. 21, 1998), 12th Dist. No. CA98-01-001, unreported ('although the trial court must consider the offender's ability to pay, it need not hold a separate hearing on that issue'). 'All that R.C. 2929.19(B)(6) requires is that the trial court consider the offender's present and future ability to pay.' *State v. Dunaway,* 12th Dist. No. CA2001-12-280, 2003-Ohio-

1062, at 36; *Martin,* 140 Ohio App.3d at 33, 746 N.E.2d 642" *Id.* at *4-5, 746 N.E.2d 642. See also *State v. Thompson,* 5th Dist. No. 06-CA-62, 2008-Ohio-435, at ¶ 19. While it would be preferable for the trial court to expressly state on the record that it has considered a defendant's present and future ability to pay a fine, it is not required. *State v. Parker,* 2nd Dist. No. 03CA0017, 2004-Ohio-1313, ¶ 42, citing *State v. Slater,* 4th Dist. No. 01 CA2806, 2002-Ohio-5343. "The court's consideration of that issue may be inferred from the record under appropriate circumstances." *Id.* at paragraph 27.

**{¶80}** Appellant, on January 29, 2018, filed a motion to waive the mandatory fine due to his indigency. In his affidavit that was attached to the motion, he alleged that he had previously been determined to be indigent by the court and unable to retain counsel to represent him and that he remained an indigent person. At the sentencing hearing in this matter, the trial court stated that based on appellant's admission that he was earning at least $20,000.00 month in the drug trade in California, which appellant confirmed at the sentencing hearing, it was not going to find appellant indigent and was not going to waive the mandatory fine. We find that the trial court considered appellant's ability to pay a fine and that the trial court's decision was not unreasonable, arbitrary or unconscionable. We find no abuse of discretion in the trial court's imposition of the mandatory fine.

**{¶81}** Appellant's fourth assignment of error is, therefore, overruled.

V

**{¶82}** Appellant, in his fifth assignment of error, argues that the trial court erred in ordering him to pay court costs when he was indigent.

{¶83} In regard to court costs, we note R.C. 2947.23(A)(1)(a) states in pertinent part: "In all criminal cases, including violations of ordinances, the judge or magistrate *shall* include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs. * * *." (Emphasis added). Accordingly, even if a defendant is indigent, a sentencing court must include the costs of prosecution in the sentence and render a judgment against the defendant for costs. *State v. McHenry*, 5th Dist. Stark No. 2017CA00119, 2017–Ohio– 7672, ¶ 12, citing *State v. White*, 103 Ohio St.3d 580, 2004–Ohio–5989, 817 N.E.2d 393, ¶ 8. *But see* R.C. 2949.092. Furthermore, appellant did not object to the imposition of court costs, even though the trial court orally stated they were part of the sentence, and the trial court did not find appellant indigent based on appellant's admission that he was making at least $20,000.00 a month in the drug trade in California. . Sentencing Tr. at 15-16. Upon review, we find no reversible error in this instance in regard to the imposition of court costs.

{¶84} Appellant's fifth assignment of error is, therefore, overruled.

{¶85} Accordingly, the judgment of the Muskingum County Court of Common Pleas is affirmed.

By: Baldwin, J.

Gwin, P.J. and

Earle Wise, J. concur.