PITMAN, J.
A jury convicted Defendant Darandall Boyette of armed robbery with a firearm. The trial court sentenced him as a habitual offender to 99 years at hard labor without benefit of probation, parole or suspension of sentence. Defendant appeals. For the *630 following reasons, we affirm Defendant's conviction and sentence.
FACTS
On October 7, 2014, the state filed a bill of information charging Defendant with armed robbery with a firearm. On February 21, 2017, the state filed an amended bill of information and alleged that on or about September 3, 2014, Defendant committed an armed robbery of Chastity Williams[1] when the dangerous weapon used in the commission of the crime of armed robbery was a firearm.
On May 26, 2016, a district judge signed an order recusing the district attorney for the Third Judicial District and his office from the prosecution of this case and appointing the Attorney General's Office as the prosecutor.
On September 14, 2016, Defendant filed a pro se motion to suppress evidence obtained through the search of his father's house. He stated that law enforcement conducted a warrantless search after allegedly receiving verbal consent to search from his father. He contended that the search of his bedroom, during which law enforcement found six $100 bills under the mattress, was made without his consent. He argued that the search of an outdoor shed, during which law enforcement found a pair of black Nike tennis shoes and white gloves, was not made with his father's consent because he only consented to the search of the "residence." A hearing on the motion to suppress was held on September 19, 2016. The trial court denied the motion after finding that the state had met its burden of proof that the consent to search was freely and voluntarily given.
The trial began on March 27, 2017. Chastity Williams testified that in 2014 she lived with her boyfriend, Roderick Hillard, at 121 Williams Street in Marion, Louisiana. She noted that she had known Defendant for a few years and showed on a map that the house where he lived on Alice Street was a five-minute walk from her house. She stated that Defendant visited her house often and had been there the day before the robbery.
Williams further testified that at approximately 3:00 a.m. on September 3, 2014, she and Hillard were asleep in their bedroom and were awakened when two intruders turned on the lights and pulled them out of bed. She stated that the suspects entered her home through a window into the second bedroom. She noted that the window was closed when she went to bed but was open after the robbery. She explained that she kept a stick in the top part of the window to lock it.
Williams described one intruder as wearing a black hoodie, dark jeans and brown Timberland boots and having something white over his head. This person went through her belongings in her closet. She described the other intruder as wearing dark jeans and black Nike tennis shoes and had a bandana and sunglasses on his face with a hood on his head. She testified that this person stood in the hallway and waved a black automatic handgun at her and Hillard. She noticed the intruders' shoes because they made her and Hillard lie on the floor during the robbery. She identified the tennis shoes seized during the search of Defendant's father's house as the same type as those worn by one of the intruders. Both intruders wore white cotton gloves.
*631 Williams further testified that the boot-wearing intruder went through a pair of her pants that were on the bedroom floor and took $1,300 from them. She explained that Hillard told the intruders where the money was, but she did not give them permission to take the money. The boot-wearing intruder grabbed Hillard, tried to tie him up and walked him toward the bathroom. She was afraid the intruders would shoot Hillard in the bathroom, so she grabbed him and he broke free of his restraints. Hillard then exited the house through a window because he heard someone outside. The tennis shoe-wearing intruder hit her on the head with the gun and then fled. She grabbed the other intruder around the neck and chased him out of the house with a beer bottle. She followed the intruders outside and saw them run away from the house. She then went inside and could not locate her cell phone, so she went to Hillard's grandmother's house to call the police. She estimated that the robbery lasted 20 to 25 minutes.
Williams also testified that she told the 9-1-1 operator that "Darandall and Pee Wee just robbed me." She identified "Darandall" as Defendant and "Pee Wee" as Nicholas Crow. She explained that even though she did not see their faces during the robbery, she was able to identify them.
Williams stated that she had received communication from Defendant since the robbery and that she spoke to his brother, Brent. She testified that she had the following text exchange, dated June 12,[2] with Defendant:
DEFENDANT: Look dis Ran I just won't to say that I'm sorry for wat I did and I kick myself in the ass everyday for it but I can't change the past but I won't u to know that Im truly sorry and if u could, could u please help me out by writing that affidavit for me it would really help me out and tell Rod I said my bad, just wonted u to know that I was sorry
WILLIAMS: I told Brent I would then I started thankn about Wt gne happen after...is it gne b beef an Shyt after the fact...an will it help peewee to...he ddnt give me a clear enough answer he said peewee told or some[3]
DEFENDANT: Peewee get out next month but I'm still going to court because they trying to fuck over me but no it won't be no beef at all when I get out. Wat me and peewee did was a mistake and I'm sorry, it was the drug chat, Rod is my dog and I would never fuck over anybody I fuck with. But yea peewee told so now I'm fightin for my life chat and I really need u
WILLIAMS: Ill get back in touch with Brent...he said he would type it up and I just sign...I hate to see anybody in jail but I was pissed off I was tryna get a car to I called the police without thanking twice.
DEFENDANT: Thanks chat and once again I'm sorry
Williams noted that Defendant's nickname is "Ran," and hers is "Chat." She explained that Defendant's brother asked her to sign an affidavit saying she was not positive that Defendant was one of the persons who robbed her. She testified, however, that she knew Defendant was the person who robbed her and was the person who sent the above text messages. On cross-examination, she stated that she did not *632 have the phone number of the person who sent her the above text messages saved in her phone and conceded that it is possible for someone to send a text message using someone else's name.
Williams further testified that she did not believe Hillard was in on the robbery and that he told the intruders that the money was in her pants to get them to leave. She believed that Hillard did not want to call the police the night of the robbery because he did not want to turn in a friend.
Chief of Police Mark Dodd of the Marion Police Department testified that at 3:34 a.m. on September 3, 2014, he was dispatched to 104 Andrews Street on a domestic disturbance call involving Jeremy Andrews. Chief Dodd stated that he was told that Andrews had left the residence just before he arrived.
Chief Dodd testified that at 3:50 a.m., he received a call that an armed robbery had taken place at 121 Williams Street, which was approximately 200 yards from 104 Andrews Street. He then went to 121 Williams Street and met Chastity Williams, who identified the robbers as Defendant and Crow. She told him that she is related to Crow and that Defendant and Crow had been at her house that day. She described what the intruders were wearing and stated that Defendant wore black Nike high top tennis shoes and Crow wore boots. Chief Dodd investigated the scene of the crime and noted that the inside of the house was "a mess" and that Williams's detailed description matched what he observed. She told him that the robbers entered her house through a window, and he observed two sets of shoeprints beneath this window-one appearing to be made by tennis shoes and the other by deep-lugged boots. He also observed the shoeprints at the back door.
Chief Dodd further testified that he then went to 359 Alice Street, which is a trailer belonging to Defendant's father, Lugene Boyette ("Lugene"), because Defendant was known to stay there. He knocked on the door; Crow answered and told him that he had been asleep. Because Williams had told him that a weapon was involved in the crime, he placed Crow in handcuffs and advised him of his rights. He then observed someone lying on the couch, completely covered by a blanket. He drew his weapon and ordered the person under the blanket to show his hands, which he did. He identified this person as Defendant. He also testified that another officer found Andrews hiding in the trailer.
Chief Dodd then knocked on Lugene's bedroom door. When Lugene exited the bedroom, Chief Dodd informed him that Defendant and Crow had been implicated in an armed robbery and requested permission to search the house for evidence from the crime. Lugene gave him permission to search. He asked which room was Defendant's, and Defendant told him. He seized six $100 bills that he found under the mattress in Defendant's bedroom and then searched the rest of the trailer.
Chief Dodd also testified that he walked outside the trailer and observed shoeprints coming from Alice Street onto Lugene's property. He noted that these shoeprints matched the shoeprints he saw at 121 Williams Street. He followed these shoeprints-the shoeprints made by the boots went toward the front of the trailer, and the shoeprints made by the tennis shoes led to a shed behind the trailer. The shed had no door, and Chief Dodd entered the shed and found a pair of black Nike tennis shoes with white gloves stuffed inside them. The state introduced into evidence photographs of the shoeprints taken by him on the night of the robbery at 121 Williams Street and 359 Alice Street. He *633 testified that the shoeprints of the tennis shoes have a distinct zig-zag pattern and that this pattern matched the tread pattern of the Nike tennis shoes found in the shed. He noted that it had rained earlier in the evening.
Chief Dodd further testified that he obtained DNA buccal swabs from Defendant and Crow and sent the tennis shoes and the gloves to a crime lab. The state and defense stipulated that a crime lab analyst was unable to find the presence of amplifiable human DNA on the tennis shoes or the gloves.
On cross-examination, Chief Dodd testified that he had one day of basic training on footprint analysis. He also stated that no weapon was found on Lugene's property.
Robert Foley, a forensic document examiner, testified that he compared handwriting exemplars written by Defendant to an unsigned letter sent to Judge Cynthia Woodard, received by her on July 9, 2015. Foley read part of the letter in court: "I know you receive letters all the time from people claiming they didn't do the crime they're charged with. I'm not like that. I did play a part in the robbery, but there's more to it-there's more people involved that should be in jail, as well."[4] Foley testified that the person who wrote the letter was the same person who provided the handwriting exemplar, i.e., Defendant.
Lugene testified for the defense. He stated that when he went to bed the night of the robbery, which was around 11:30 p.m., Defendant was asleep on the couch. He next saw Defendant when the police knocked on his bedroom door. He stated that Defendant worked at a saw mill and kept his earnings under his mattress in his bedroom and was saving to buy a car. He did not recall any other people being at his house that day or when he went to sleep, but stated that Crow and Andrews were there when he woke up. On cross-examination, he testified that he was not sure if Defendant left the house that night, but he did not hear anyone coming or going after he went to sleep.
Defendant elected to testify on his own behalf. He stated that he worked from 7:00 a.m. to 3:30 or 4:00 p.m. the day before the robbery. He earned about $300 a week working at a saw mill, had no expenses and kept his earnings in his room. He testified that after work, he spent time at his father's house with his friends, including Crow, Andrews, Hillard and several others. Defendant noted that he grew up with Hillard and went to the house on Williams Street often, including the day before the robbery. He claimed that his friends had gone to 121 Williams Street several times before to buy drugs. He testified that the people at his house discussed the robbery, but he was not part of the planning and did not suggest that anyone commit the robbery. He thought the robbery discussion was "a joke" and that it would not be carried out. He stated that he did not commit the armed robbery and that the statement in his letter to Judge Woodard was not a confession. He confirmed that he had a pair of Nike tennis shoes, but the shoes found during the investigation were not his. He admitted that he had been convicted of a felony four or five times. He was aware that Crow implicated him in the robbery, but had retracted his statement. He denied texting Williams and stated that he did not have a cell phone while in jail.
On cross-examination, Defendant testified that he was smoking marijuana and snorting cocaine at his father's house the *634 evening before the robbery and that the people at the house bought the drugs from Hillard and Williams. He noted that there were a lot of people coming and going that night and that Andrews was the last to leave around 3:00 a.m. He assumed Andrews was going home to 104 Andrews Street. He stated that Crow was staying at his house and left around 1:30 or 2:00 a.m. and was back before the police arrived around 4:00 a.m. He stated that Andrews came back about ten minutes before the police officers arrived. When questioned about the discrepancy between his and Lugene's testimonies about who was at the house the night of the robbery, Defendant stated that Lugene forgot or "got the timing wrong."
Defendant denied sending text messages to Williams, but he confirmed that his nickname is "Rand," that Hillard's nickname is "Rod," that Crow's nickname is "Pee Wee" and that he has a brother named Brent. He stated that he does not call Williams by her nickname, "Chat." He testified that he had been in jail since he was arrested for the robbery. He stated that people in jail had been caught with cell phones, including someone in his dorm. He also testified that Williams was mistaken about his being one of the robbers.
Defendant further testified that the $600 found in his room was his money that he had saved. He noted that it had rained the night of the robbery and that it was easy to hide things in the woods and culverts in the area. He testified that he did not write a letter to Cade Nolan, a police officer.
Defendant also testified that he was aware Crow had pled guilty to aggravated burglary. The state introduced into evidence a transcript of Crow's guilty plea. The factual basis set forth in Crow's Boykin exam states that Crow and Defendant pulled Williams and Hillard from their bed and stole over $1,200 and some iPhones from them while armed with a semiautomatic weapon and that Williams and Hillard were in fear for their lives. Crow certified that those facts were accurate and that he took part in these actions.
Nicholas Crow testified that he pled guilty to aggravated burglary in a matter concerning Chastity Williams.
Robert Foley testified as a rebuttal witness. The state introduced into evidence a letter addressed to Detective Cade Nolan and signed "Darandall Boyette." The writer of the letter stated that he was incarcerated for armed robbery and offered to give names of people involved in other crimes in exchange for help. Foley stated that the person who wrote the letter to Det. Nolan was the same person who wrote the letter to Judge Woodard, i.e., Defendant. He noted that the signature on the letter to Det. Nolan matched the signature Defendant provided on the handwriting exemplar.
Deputy Keith Blackman also testified as a rebuttal witness. He stated that he recently retired from the Union Parish Sheriff's Office where he was the supervisor of the criminal investigation division. On September 3, 2014, he assisted the Marion Police Department in its investigation of the armed robbery at 121 Williams Street. He and Chief Dodd interviewed Crow after advising him of his rights. Crow told him who the other armed robber was; and after Crow's interview was completed, Defendant was arrested for the armed robbery. He testified that one of his responsibilities was to keep control of physical evidence. He received as evidence cell phones that were seized on June 22, 2016, at the Union Parish Detention Center from an inmate housed in the same dorm as Defendant. He stated that inmates were free to move around the dorm during the day. The sheriff's office was unable to determine any phone numbers that had been contacted from the seized cell phones. He acknowledged *635 that no cell phone was found in Defendant's possession.
On March 29, 2017, the jury found Defendant guilty as charged of armed robbery using a firearm.
On April 7, 2017, the state filed a bill of information and requested that the trial court sentence Defendant as a fourth felony offender in accordance with La. R.S. 15:529.1(A)(4)(a).
On April 19, 2017, the trial court sentenced Defendant to 25 years at hard labor without benefit of probation, parole or suspension of sentence for the armed robbery and to five years at hard labor without benefit of probation, parole or suspension of sentence for the use of a firearm, with the sentences to run consecutively.
On May 10, 2017, the trial court found that the state proved that Defendant is a habitual offender convicted of four prior felonies within the ten-year period. It rescinded its prior sentence in this case and sentenced Defendant as a habitual offender to 99 years at hard labor without the benefit of probation, parole or suspension of sentence.
On May 25, 2017, Defendant file a motion for reconsideration of sentence. He contended that the sentence imposed is unduly harsh and imposes needless pain and suffering and that the trial court did not consider all the factors that should have resulted in a lighter sentence. On June 28, 2017, a hearing was held on the motion to reconsider sentence. On September 18, 2017, the trial court filed a ruling denying the motion.
Defendant appeals.
DISCUSSION
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold , 603 So.2d 731 (La. 1992) ; State v. Robinson , 51,830 (La. App. 2 Cir. 2/28/18), 246 So.3d 725. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana , 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).
Sufficiency of the Evidence
Defendant argues that the trial court erred by finding that there was sufficient evidence upon which to base a conviction for armed robbery. He contends that there was no way for Williams to positively identify the intruders because their faces were covered and they did not speak during the robbery. He notes that no DNA could be found on the gloves or tennis shoes to match any individual. He contends that Lugene, Andrews or some other unknown individual could have partnered with Crow to commit the robbery. He also alleges that Hillard was involved in the crime because he showed where the money was and refused to testify. Defendant argues the evidence presented did not exclude every reasonable hypothesis of innocence.
The state argues that the evidence is sufficient to support Defendant's conviction. It states that the jury reasonably concluded that Defendant was guilty by considering all testimony and evidence before it, including the text messages in which Defendant sought assistance and expressed remorse. It notes that several $100 bills were taken from Williams and six $100 bills were found beneath a mattress near where Defendant was apprehended.
The standard of review for a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the *636 essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Hearold , supra ; State v. Smith , 47,983 (La. App. 2d Cir. 5/15/13), 116 So.3d 884. See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robertson , 96-1048 (La. 10/4/96), 680 So.2d 1165.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writ denied , 02-2595 (La. 3/28/03), 840 So.2d 566, and writ denied , 02-2997 (La. 6/27/03), 847 So.2d 1255, and cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004), citing State v. Tolliver , 35,930 (La. App. 2 Cir. 5/8/02), 818 So.2d 310, and State v. Bacon , 578 So.2d 175 (La. App. 1 Cir. 1991), writ denied , 93-0694 (La. 3/30/95), 651 So.2d 857. The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam , 36,118 (La. App. 2 Cir. 8/30/02), 827 So.2d 508.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64(A). La. R.S. 14:64.3 provides for additional penalties when the dangerous weapon used in the commission of the armed robbery is a firearm.
The state presented sufficient evidence to support Defendant's conviction. It proved beyond a reasonable doubt that Defendant took items of value, i.e. $100 bills and cell phones, from Williams's immediate control by the use of force or intimidation while armed with a dangerous weapon, i.e., a firearm.
The testimony of Williams establishes that the state proved all of the elements of the crime of armed robbery. She identified Defendant and Crow as the intruders who entered her house through a window in the middle of the night, pulled her and her boyfriend from their bed and brandished a gun at them while going through and taking her belongings. She made this identification to the 9-1-1 operator immediately after the robbery and maintained this identification through the trial. Although Defendant contends that there was no way for her to positively identify the intruders because their faces were covered and they did not speak during the robbery, Williams testified that she had known Defendant for several years, that he was her neighbor and that he visited her house often, including the day before the robbery. She also gave a detailed description of what the intruders were wearing, notably their shoes and white cotton gloves. She identified the Nike tennis shoes seized from Lugene's shed as the same type as those worn by one of the intruders. She testified that she believed that the text messages she received from a person expressing remorse *637 and asking her to sign an affidavit were from Defendant.
Williams testified that Defendant and Crow took items of value that belonged to her and that these items were in her immediate control. She stated that the boot-wearing intruder went through a pair of her pants that were on the bedroom floor and took $1,300 from them. She was in the bedroom when this taking occurred. She testified that the $1,300 was from her most recent paycheck. She also noted that both her and Hillard's cell phones were missing from the house after the robbery.
Williams also testified that Defendant used force or intimidation during the commission of the armed robbery and that he was armed with a dangerous weapon. She stated that the tennis shoe-wearing intruder, i.e., Defendant, waved a black automatic handgun at her and Hillard and then hit her on the head with the gun before fleeing from the house. She stated that when the intruders tied up Hillard and led him to the bathroom she was afraid they were going to shoot Hillard.
Chief Dodd's testimony corroborated Williams's testimony. He noted that Williams's description of the crime scene matched what he observed. The tennis shoes and gloves he recovered from Lugene's shed matched the tennis shoes and gloves Williams described one of the intruders to be wearing. He also testified that the tread on the tennis shoes matched the tread pattern of the shoeprints found at the crime scene and at Lugene's property.
Further, Foley testified that Defendant wrote the letter to Judge Woodard in which he admitted to playing a part in the robbery.
Although Defendant testified that he did not commit the armed robbery, the conviction suggests that the jury did not find Defendant to be credible and, instead, accepted the testimony of Williams.
Considering the testimony and evidence presented at trial, a rational jury could have found beyond a reasonable doubt that the state proved all of the essential elements of armed robbery with a firearm.
Accordingly, this assignment of error lacks merit.
Bill of Information
Defendant argues that the trial court erred by sentencing him for a crime punishable by life imprisonment without presentment to a grand jury. He states that the state had access to the records used to enhance his sentence before he was first charged. He contends that the state should have submitted the case to a grand jury and charged him by indictment.
The state argues that this assignment of error is not properly before this court because Defendant did not file a motion to quash the bill of information or make any objections to it. It also argues that the prosecution against Defendant was properly instituted by bill of information. It contends that Defendant did not face a sentence of life imprisonment at the time he was initially charged with committing an armed robbery; it was only when the state filed a habitual offender bill that he was exposed to a life sentence.
A motion to quash may be filed of right at any time before commencement of the trial, when based on the ground that the information charges an offense for which prosecution can be instituted only by a grand jury indictment. La. C. Cr. P. art. 535(A)(6). When a defendant does not timely object to a perceived error in a bill of information, the error is considered waived. See State v. Parker , 49,009 (La. App. 2 Cir. 5/15/14), 141 So.3d 839.
*638 Prosecution of a felony shall be initiated by indictment or information, but no person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury. La. Const. art. I, § 15. A prosecution for an offense punishable by death, or for an offense punishable by life imprisonment, shall be instituted by indictment by a grand jury. La. C. Cr. P. art. 382(A). Other criminal prosecutions in a district court shall be instituted by indictment or by information. Id.
The constitutional provision and article 382 do not apply to the institution of enhanced-penalty proceedings, pursuant to La. R.S. 15:529.1, after a defendant has been convicted of a crime charged. State v. Alexander , 325 So.2d 777 (La. 1976) ; State v. Keys , 29,369 (La. App. 2 Cir. 5/7/97), 694 So.2d 1107, writ denied , 97-1387 (La. 10/31/97), 703 So.2d 21, and writ denied , 97-1497 (La. 10/31/97), 703 So.2d 21. They apply only to the substantive crime with which an accused is initially charged. State v. Alexander , supra ; State v. Keys , supra .
A multiple-offender bill of information does not charge a crime, but is merely a method of informing the sentencing court of the circumstances and requesting an enhancement-of-penalty. State v. Alexander , supra . Thus, multiple billing need not be by grand jury indictment in cases involving possible life sentences. State v. Jolla , 337 So.2d 197 (La. 1976).
The crime of armed robbery is punishable by imprisonment at hard labor for not less than 10 years and for not more than 99 years, without benefit of parole, probation or suspension of sentence. La. R.S. 14:64(B). When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation or suspension of sentence. La. R.S. 14:64.3(A).
The record does not reflect that Defendant filed a motion to quash the bill of information. Therefore, Defendant's alleged error is considered waived. Further, because the offense with which the state initially charged Defendant, i.e., armed robbery with a firearm, was not punishable by life imprisonment, the state was not required to indict Defendant by grand jury.
Accordingly, this assignment of error lacks merit.
Recusal of the Office of the District Attorney
Defendant argues that the trial court erred by allowing the Office of the District Attorney to take part in the case even though it had been recused. Defendant alleges that the involvement of Keith Blackman, an investigator with the Office of the District Attorney, in the investigation and prosecution of this case violates the recusal.
The state argues that any issue regarding a violation of an order of recusal has been waived and abandoned. It contends that Defendant has not alleged that he was in any way prejudiced by the activity he complains of, nor does he assert what the trial court should have done to correct any alleged wrongdoing. It also argues that because Defendant did not object to this alleged error at the trial, the error has not been preserved for appeal. It contends that the recusal of a district attorney does not prohibit any person in that office from being a fact witness.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841(A). In order to preserve an issue for appellate review, a party must state an objection contemporaneously *639 with the occurrence of the alleged error, as well as the grounds for the objection. State v. Mosley , 51,168 (La. App. 2 Cir. 6/21/17), 223 So.3d 158.
A review of the record does not show that Defendant made a contemporaneous objection to Dep. Blackman's testimony. Therefore, this assignment of error was not preserved for appellate review.
Motion to Suppress
Defendant argues that the trial court erred by failing to sustain his motion to suppress the seized evidence. He contends that the state did not prove that the consent given by Lugene was free and voluntary and did not prove the scope of Lugene's consent. He notes that Crow, a visitor, answered the door and that the officers entered the house and drew their guns prior to obtaining the homeowner's consent to search. He further avers that the search exceeded the scope of the consent given by Lugene, differentiating between searching the "house" and the "premises." Defendant also complains that the officers did not get written consent to search the house and that the officers obtained consent only from Lugene.
The state argues that the warrantless search of Lugene's house was valid because Lugene freely and voluntarily gave consent to search, and written consent was not required. It avers that Chief Dodd's testimony during the hearing on the motion to suppress was undisputed, and Chief Dodd testified that he did not force, threaten, coerce or intimidate Lugene to provide consent to search. It notes that Lugene was present at the hearing and sequestered as a witness, but Defendant did not call him to testify to contradict Chief Dodd's testimony. It argues that Lugene, as the owner and an occupant of the residence, had common authority over his house and had the authority to consent to a search of the entire home. It notes that Lugene did not limit his consent to search his residence in any way.
The right of every person to be secure in his person, house, papers and effects, against unreasonable searches and seizures, is guaranteed by the Fourth Amendment to the United States Constitution and article I, § 5, of the Louisiana Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is per se unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Thompson , 02-0333 (La. 4/9/03), 842 So.2d 330 ; State v. Tatum , 466 So.2d 29 (La. 1985) ; State v. Ledford , 40,318 (La. App. 2 Cir. 10/28/05), 914 So.2d 1168. To claim the protection of the Fourth Amendment, the claimant must have a legitimate expectation of privacy in the place of intrusion and the expectation must be one that society is prepared to recognize as reasonable. Minnesota v. Olson , 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).
A defendant may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. C. Cr. P. art. 703. When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the state bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. La. C. Cr. P. art. 703(D) ; State v. Johnson , 32,384 (La. App. 2 Cir. 9/22/99), 748 So.2d 31.
A warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and United States Constitutions. Schneckloth v. Bustamonte , 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ;
*640 State v. Raheem , 464 So.2d 293 (La. 1985) ; State v. Crews , 28,153 (La. App. 2 Cir 5/8/96), 674 So.2d 1082. To be valid, consent must be (1) free and voluntary, in circumstances that indicate the consent was not the product of coercion, threat, promise, pressure or duress that would negate the voluntariness; and (2) given by someone with apparent authority to grant consent, such that the police officer reasonably believes the person has the authority to grant and consent to the search. State v. Bates , 51,890 (La. App. 2 Cir. 2/28/18), 246 So.3d 672, citing United States v. Matlock , 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), and State v. Howard , 49,965 (La. App. 2 Cir. 6/24/15), 169 So.3d 777, writ granted , 15-1404 (La. 12/16/16), 212 So.3d 1168, and aff'd , 15-1404 (La. 5/3/17), 226 So.3d 419. Oral consent is sufficient; written consent is not required. State v. Nelson , 51,009 (La. App. 2 Cir. 2/1/17), 215 So.3d 389, citing State v. Shed , 36,321 (La. App. 2 Cir. 9/18/02), 828 So.2d 124, writ denied , 02-3123 (La. 12/19/03), 861 So.2d 561. Once voluntary consent is given, it continues until it is revoked or withdrawn. State v. Malone , 39,996 (La. App. 2 Cir. 9/23/05), 912 So.2d 394.
Common authority to consent arises from mutual use of the property to be searched, so it is reasonable to recognize that any co-inhabitant may permit a search or inspection in his own right; the other co-inhabitants have assumed the risk that one of them might permit the common area to be searched. State v. Williams , 38,379 (La. App. 2 Cir. 11/25/03), 858 So.2d 878, writ denied , 03-3535 (La. 3/12/04), 869 So.2d 807, citing United States v. Matlock , supra . Louisiana courts have applied the principle of common authority to searches made with the consent of parents having uncontrolled access to the belongings of children residing with them. See State v. Packard , 389 So.2d 56 (La. 1980) ; State v. Cook , 345 So.2d 29 (La. 1977).
When officers rely upon consent to justify a warrantless search, they have no more authority than they have been given by the consent. State v. Malone , supra , citing Fla. v. Jimeno , 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Therefore, any search beyond the permitted intrusion invalidates the voluntariness of the consent given to the extent that the search exceeds the parameters for which the permission was granted. State v. Malone , supra . Consent can be limited, in time, duration, area and intensity, and it may be revoked at any time, even after the search has begun. Id. Whether a search is authorized by warrant or by consent, the scope of the search is limited by the terms of its authorization. State v. Malone , supra , citing Walter v. United States , 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness, i.e., what would the typical reasonable person have understood by the exchange between the officer and the suspect. Fla. v. Jimeno , supra .
In reviewing the correctness of the trial court's pretrial ruling on a motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress and may review the entire record, including testimony at trial. State v. Monroe , 49,365 (La. App. 2 Cir. 11/19/14), 152 So.3d 1011. Great weight is placed upon the trial court's ruling on a motion to suppress in regard to the finding of facts because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Crews , supra . Accordingly, this court reviews the trial court's ruling on a motion to suppress under the manifest error standard for factual determinations, *641 while applying a de novo review to its findings of law. State v. Hemphill , 41,526 (La. App. 2 Cir. 11/17/06), 942 So.2d 1263, writ denied , 06-2976 (La. 3/9/07), 949 So.2d 441.
At the motion to suppress hearing, Chief Dodd testified consistently with his trial testimony and provided additional testimony about the search of Lugene's property. He stated that after Crow and Defendant were handcuffed, he asked Defendant where Lugene was, and Defendant responded that he was sleeping in his bedroom. Chief Dodd knocked on the bedroom door and identified himself. Lugene opened the bedroom door, and Chief Dodd informed him of the robbery and that he needed to search the "premises." Lugene responded, "Okay." Chief Dodd did not obtain written permission on a consent to search form because he did not have the form with him and because "that gun was still floating around." Chief Dodd testified that he did not force, threaten, coerce, intimidate or in any other way make Lugene give him permission to search his premises. He stated that Lugene voluntarily consented to the search and at no time did Lugene tell him to stop searching the property.
A review of the motion to suppress hearing demonstrates that Lugene freely and voluntarily consented to the search. There is no evidence that suggests Chief Dodd used coercion, threats, promises, pressure or duress to produce Lugene's consent to search the premises. Chief Dodd understood Lugene to be the owner of the trailer and Defendant's father. Therefore, Lugene had common authority to provide consent to search the premises. See State v. Packard , supra . Chief Dodd testified that he asked for Lugene's consent to search the "premises," so the scope of the search encompassed the trailer and its surrounding property, including the shed. Further, Lugene was present at the motion to suppress hearing, but defense counsel did not call him to testify regarding his consent to search. Considering the totality of the evidence, Lugene provided free and voluntary consent to law enforcement to search, and the search conducted by law enforcement did not exceed the scope of the consent given.
Accordingly, this assignment of error lacks merit.
Challenge for Cause
Defendant argues that the trial court erred by failing to excuse the entire panel when one juror said something prejudicial in front of the entire panel. He states that he exercised a challenge for cause to exclude potential juror Richard Scarborough,[5] who allegedly made a comment in front of the bailiff and other jurors. He states that the trial court granted the challenge, but nothing was done regarding the other jurors who were present when the statement was made.
The state argues that Defendant has provided no basis for excusing the entire jury panel over an alleged prejudicial statement. It states that La. C. Cr. P. art. 797 does not provide for removing an entire potential panel of jurors because of an alleged prejudicial comment by a potential juror and that Defendant failed to advise the court as to the prejudicial nature of any comment allegedly uttered by Scarborough. The state also argues that because no objection was made to empaneling the jury, the issue was not preserved for appeal.
*642 During voir dire, the following colloquy occurred outside the presence of the potential jurors:
THE COURT: We are in the small courtroom outside the presence of the jury. Mr. Boyette, his lawyer, and the counsel for the State is here, and we have one of the jurors, Mr. Scarborough. And the Deputy McKinney told me something that he overheard as I was having the jurors released. So, Deputy McKinney, would you raise your right hand and be sworn, please, sir.
* * *
THE COURT: And would you tell - would you tell the lawyers on the record what you - and I think you were - for the record to be clear, we did this in Chambers and the lawyers said that this is how they would like me to handle it.
* * *
DEP. MCKINNEY: Mr. Scarborough indicated he didn't want to be here, and he hoped that he was found guilty and they hung him. And then he said that he really needed to be at work because, I think, of another case pending, that he couldn't miss work, that he was going to do what he wanted to do. And some other jurors heard him, so I had to report it.
SCARBOROUGH: I - well, partial - I mean, I didn't say I was going to do what I wanted to. And as for the comment about, I hoped he was found guilty and they hung him, my exact words - I don't care. I was mad. And when I get mad, the filter between by brain and my mouth disappears. But I've had - since then, I've had time to calm down, and get a hold of myself.
Counsel for the state asked Mr. Scarborough several questions about his ability to be fair and impartial. Mr. Scarborough responded that he could. The colloquy continued:
PROSECUTOR: And, could - did you say it loud enough where other potential jurors may have heard you?
SCARBOROUGH: Probably did.
Counsel for Defendant did not ask any questions of Mr. Scarborough. The trial court then asked Mr. Scarborough to wait in another room. The colloquy continued:
THE COURT: I don't want him around the rest of the jurors while we decide what to do. Do y'all want me to have the rest of the jurors brought in one at a time?
DEFENSE COUNSEL: I - I don't think that's - well -
THE COURT: The - the other eight, to see if anybody heard anything and if y'all want to question them about it. That's up to y'all.
PROSECUTOR: I don't care, Judge. I'll do whatever you want to do.
DEFENSE COUNSEL: I don't think it's necessary, Your Honor. I was going to challenge him for cause.
THE COURT: Well, I'm going to grant that challenge for cause, and I'm going to appoint a lawyer for him, and have him - but - but, I want to know at this point is if you want me to talk to the other jurors.
DEFENSE COUNSEL: Oh, I don't.
THE COURT: Okay. Mr. Strider, you don't either?
PROSECUTOR: No, ma'am.
THE COURT: Okay. Then I'll just leave that as it is.
The state is correct in its assertion that there is no procedure under La. C. Cr. P. art. 797 for removal of a jury panel when a juror makes a statement regarding his ability to be impartial. Thus, La. C. Cr. P. art. 797 is inapplicable in this case.
*643 Further, defense counsel did not make a contemporaneous objection to the other jurors being empaneled after hearing Scarborough's statements. La. C. Cr. P. art. 841(A) ; State v. Mosley , supra . The trial court expressed its willingness to question the potential jurors who might have overheard Scarborough's comment to determine what they heard. Defense counsel declined this offer and stated that it was not necessary.
Therefore, this assignment of error was not preserved for appellate review.
CONCLUSION
For the foregoing reasons, we affirm the conviction and sentence of Defendant Darandall Boyette.
AFFIRMED.

In the bill of information, the victim's name appears as "Chasity." At trial, she stated that her name is "Chastity."

The screenshots of the text messages do not state the year these messages were exchanged.

The ellipses in Williams's text messages are how she composed the text messages. They are not an indication that portions of the text messages were removed.

This quotation is how it appears in the trial transcript. The letter itself contains a few spelling and grammatical errors that do not appear in the trial transcript.

In the record, this juror's name is spelled as "Scarborough" and "Scarbrough." This opinion will refer to him as "Scarborough," and portions of the voir dire transcript quoted in this section have been altered to this spelling.